In re Evan ZHANG, Debtor.

United States Trustee, Plaintiff

v.

Evan Zhang, Defendant.

Bankruptcy No. 09–31153.
Adversary No. 10–3141.

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

Jan. 10, 2012.

Jerry A. Meadows, Dayton, OH, for Defendant.

**Decision Denying the Debtor's Chapter 7 Discharge Pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (B) and 727(a)(4)**

GUY R. HUMPHREY, Bankruptcy Judge.

The issue in this adversary proceeding is whether the debtor should be denied a

discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (B), 727(a)(3), 727(a)(4)(A) and 727(a)(5). For the reasons set forth below, the court determines that the debtor's discharge should be denied pursuant to §§ 727(a)(2) and 727(a)(4), but not as to the other bases requested by the United States Trustee. This decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. Procedural Background

On March 6, 2009 the debtor, Evan Zhang ("Zhang"), filed a Chapter 13 petition (estate doc. 1), but the case was converted to Chapter 7 on October 2, 2009 (estate doc. 53). Daniel McDermott, the United States Trustee for Region 9 (the "UST"), timely filed his complaint requesting the court to enter a judgment denying Zhang his discharge (Adv. Doc. 1) and Zhang answered, generally denying the UST's allegations (Adv. Doc. 4). The court conducted the trial on August 9, 2011.

## II. Findings of Fact

### A. *Introduction*

Zhang's complex financial history involves the interrelationship and transfer of funds between three separate corporations, one of which is wholly owned by Zhang's non-filing spouse, one of which is partially owned by Zhang, and a third wholly owned by Zhang; assets of those corporations; bank accounts associated with those corporations; his personal bank accounts; and, to some extent, vaguely explained family and marital issues. The story also concerns Zhang's paid employment and volunteer work in the field of military defense research. As the UST essentially concedes, Zhang's financial picture is incomplete and, at times, confusing. Military contracts, loans and other banking transactions were referenced throughout the trial, sometimes with little or no documentation. Nevertheless, as will be detailed, the UST has met his ultimate burden of establishing that Zhang is not entitled to a discharge due to certain material false oaths and the concealment of Zhang's income and other funds from creditors.

### B. *Background of Zhang and his Wife, Junquiao Wu*

The Debtor is Evan You Wen Zhang, commonly known as Evan Zhang (Trial Transcript (doc. 26) ("Tr."), p. 36). He has advanced education and expertise that has allowed him to research and develop technologically advanced products and systems with both military and commercial applications (Tr., pp. 93 & 131).

Zhang was divorced and is now re-married (Tr., p. 126). His current wife, who is not a debtor in this bankruptcy, is named Junquiao Wu ("Wu").[1] Wu has a high school education (Pl. Exh. 3, p. 14). She testified she had some management experience in China and also "some experience making a machine." (Pl. Exh. 3, p. 15). Wu's deposition, admitted at trial, does not provide much detail as to the role she plays with the two corporations she owns, other than the fact that she has an equity interest in those entities, nor does it explain her role as the controlling officer of Eyztek Corporation ("Eyztek") and Zybron Optical Electronics, Inc. ("Zybron Optical").

---

**1.** Through agreement of the parties, the court admitted the deposition of Wu. The parties agreed Wu was unavailable for trial and her deposition was admitted in lieu of live testimony. *See* Fed.R.Civ.P. 32(a)(4) (use of depositions for unavailable witnesses), applicable to this adversary proceeding by Fed. R. Bankr. P. 7032.

## C. *The Zhang and Wu Entities*

### 1. Zybron, Inc.

At all times, Zhang has wholly owned and, therefore, controlled a corporation called Zybron, Inc. ("Zybron"). Zhang's Schedule B disclosed "Sole ownership of Zybron, Inc. (no shares of stock ever issued); assets (three (3) patents, and optical lab, worth subjective estimated value of $400,000, more or less)." Zhang's Schedule B also states that the value of Zybron's assets was exceeded by the liabilities that were owed to Dan Joint Ventures III, L.P. and Uniform CCR Partners, and Capital 1 Bank, on the petition date. (Pl. Exh. 1, p. 23). The value of Zybron was listed as "unknown." While Zhang described Zybron's illiquid assets on Schedule B, he did not list any funds held in the Zybron bank accounts on the petition date.

In 2003 Fifth Third Bank loaned Zybron $254,500, which was guaranteed by Zhang. According to the statement of financial affairs and Zhang's testimony, Zybron ceased operating about 2004 because it had no contracts to complete (Pl. Exh. 1, p. 41; Tr., p. 94). (Zybron was formed prior to the other corporations discussed at trial, Zybron Optical and Eyztek.) Zhang referred to Zybron as "dissolved," meaning not that its corporate form was formally ended with the state of Ohio, but simply that is was not currently operating (Tr., p. 94).

### 2. Zybron Optical Electronics, Inc.

Zybron Optical Electronics, Inc. ("Zybron Optical") was formed in 2006 (Tr., p. 115). Zhang testified Zybron Optical received an Air Force contract in 2007. *Id.* In 2008, Zybron Optical received a contract from the Army. *Id.*

Zhang's Schedule B stated he owned "2 shares (20% ownership), Zybron Optical Electronics, Inc. (spouse of Debtor owns 8 shares, or 80%) (assets of corporation are government services contracts requiring work to be done to entitle corporation to payments; computer equipment, desks and chairs comprise remainder of assets.") (Pl. Exh. 1). The value was listed as $100. Zhang testified the $100 listed value was a "mistake" and it was based on the total consideration which he and Wu paid for the stock and not the value of the corporation. (Zhang contributed $20 for his stock and Wu contributed $80 for her stock.) (Tr., p. 101). He testified the value of the company is based on military or other contracts it receives and when a contract is finished, the company has no remaining value. *Id.*

On his Schedule I Zhang listed his occupation as "Senior Engineer" of Zybron Optical and Wu was listed as the "Senior Officer." (Pl. Exh. 1). Wu testified that she held an 80 percent interest in Zybron Optical because of a "family issue" related to Zhang's prior marriage (Pl. Exh. 3, p. 13). An employment agreement dated October 12, 2007 provided that Zhang would receive $123,760 each year as an employee and principal investigator for an Air Force contract (Debtor Exh. B). According to that employment agreement, Zhang could not work for any other companies, excepting volunteer work, in order to avoid a conflict of interest.

### 3. Eyztek, Inc.

The third corporation, Eyztek, Inc. ("Eyztek"), was formed in September 2008 (Debtor Exh. A), with its shares being solely owned by Wu (Debtor Exh. D). Wu's testimony did not indicate she had any particular expertise in military research, relevant scientific background, or any experience with military contracts (Pl. Exh. 3). According to Zhang and Wu, Eyztek's shares were held in Wu's name because "Zybron is being built before the marriage and they had some family issues, so she's not really happy about that. So

after they decide that they have another company and she's—she own one company and her spouse own another company." (Pl. Exh. 3, p. 16). Zhang also testified that Wu was "unhappy" because Zhang had been sued by his former wife, his son, and DAN Joint Venture ("DAN") and because of having been indicted by the United States Attorney (Tr., pp. 126–27).

According to Wu, Eyztek did not have any government contracts since May 2009 when it concluded a Navy contract (Pl. Exh. 9, p. 19). In addition, Ronald Fletcher, although listed as a vice president, did not receive any income from Eyztek and only helped with the company's operations as Wu's friend (Pl. Exh. 9, p. 17). Despite the fact that Eyztek was purportedly created so Wu could own her own company, the first three letters of Eyztek are consistent with the initials of Zhang (Evan You Wen Zhang). Zhang did not refute this apparent contradiction nor provide any explanation for the name chosen.

Eyztek was seeking a commercial contract concerning LED traffic light technology, and, as discussed below, received almost $100,000 in funds from Zybron Optical, but as of the trial nothing had materialized.

### D. *Zhang's and the Entities' Financial Accounts*

### 1. The Wright–Patt and Ameritrade Accounts Identified as Zhang's Personal Accounts

Zhang's Schedule B stated that the balance in his personal Wright–Patt Credit Union bank accounts (checking, savings and money market) totaled $675.55 on the petition date, but the account statements showed the most recent prepetition balance for the checking account was $3,397.40. The savings account petition date balance was $136.64 and the money market petition date balance was $346.51

(Pl. Exh. 8, pp. 11–12). Zhang's explanation was that he used the March 6, 2011 checking account balance of $297.40 and did not include the $1,500 deposit on March 10, 2011 (Tr., pp. 83–84). Using that figure, the correct balance of all three accounts would have been $780.55.

Zhang also had an Ameritrade IRA account to which he deposited and from which he withdrew funds both prior to and during the pendency of this bankruptcy case. See Pl. Exh. 9. In September 2008 Zhang transferred $60,000 from the Zybron Optical bank accounts he controlled to the Ameritrade IRA account. Further, with respect to a judgment of DAN, Zhang withdrew $20,000 on April 14, 2010 and another $15,000 on August 3, 2010 from his Ameritrade IRA account and later deposited those sums in his Wright–Patt account to pay the $35,000 settlement with DAN.

The post-petition balance for the Ameritrade IRA account reflected on the statement for the period ending September 30, 2009 (about the time of the conversion of the case from Chapter 13 to Chapter 7) was $76,508.50, contrasted with an approximate petition date balance of $30,000 (Tr., p. 41).

### 2. The Zybron Bank Accounts

Despite that Zybron in fact had no contracts after 2004, the evidence showed checking and money market bank accounts existed with National City Bank, now PNC Bank, in the name of Zybron (Pl. Exh. 11) through 2010. The evidence does not include any bank statements for the Zybron accounts for any period prior to October 1, 2009 or any other information as to whether those accounts existed on the petition date and, if so, what the balances were in those accounts on the petition date, March 6, 2009. *See* Pl. Exh. 11. On October 1, 2009 the balances in the Zybron accounts were as follows: Business Checking Plus:

$24,218.01 (Pl. Exh. 11, p. 1); and, Money Market Savings Plus: $45,893.03 (Pl. Exh. 11, p. 6). Further, these accounts, for a company that was no longer doing business, had a collective value of $85,795.47 as of October 30, 2009, shortly after the date of conversion of this case from Chapter 13 to Chapter 7 (Pl. Exh. 11, p. 1). Zhang testified the accounts were for Zybron Optical, but provided no explanation for this self-serving statement except "[t]his bank account is confused." (Tr., p. 67). This testimony also contradicts otherwise unchallenged evidence that Zhang identified the exhibit with the account statements by writing "Zybron" on the first page of the exhibit (Tr., p. 31).

During this Chapter 7, the Zybron accounts were repeatedly used for what the court concludes were personal expenses. The bank statements show a series of expenses paid for vendors such as Autozone, a Ford dealership, Dollar General, JC Penney, Meijer, China Garden Buffet, China Cottage, Subway, Marathon Oil, Speedway, Kroger, Cub Foods, Calvin Klein, and other vendors. *See* Pl. Exh. 11. In addition, an invoice for $53,500 was paid from the Zybron checking account on October 28, 2009 to "DFAS–CO." *See* Pl. Exh. 11, p. 2. Zhang provided no documentation or explanation for this transaction. Further, the Zybron accounts had various cash withdrawals, none of which were documented as anything other than what they appeared to be—funds going directly to Zhang from a business account of a company Zhang characterized as "dissolved" in 2005.

In addition, transfers to the Zybron checking account from an account ending in "518" were never explained. For instance, on April 13, 2010, $5,000 was transferred from the "518" account to the Zybron Account (Pl. Exh. 11, p. 41). Other such transfers included $2,000 on June 11, 2010 and $3,000 on July 8, 2010 (Pl. Exh. 11, pp. 45–46).

In the end, the total of the Zybron bank account balances was reduced to $68,195.39 by November 30, 2009 and $46,120.87 by December 31, 2009. By January 29, 2010, the money market account was zero and the checking account balance was $16,919.47. The checking account balance was eventually reduced to $2,474.06.[2] (Pl. Exh. 11, pp. 9, 15, 23 & 39). Zhang provided no testimony or evidence to establish that any of the disbursements or withdrawals from the Zybron accounts were Zybron business expenses, nor could he since his testimony and the evidence established that Zybron had ceased doing business by 2005. And as noted, many of the disbursements and withdrawals on their face plainly appear to have been the payment of Zhang's personal expenses.

### 3. The Zybron Optical Accounts

Despite having no role as a director or officer and being only a minority shareholder of Zybron Optical, Zhang was a signatory on all of the Zybron Optical bank accounts (Tr., p. 75). As of October 1, 2008 Zybron Optical had about $240,000 in two bank accounts with Wright Patt Credit Union (Pl. Exhs. 10 & 22).[3] By the peti-

---

**2.** UST's Exhibit 11 contains bank statements for the Zybron National City Bank "Business Checking Plus" account for October 1, 2009 through February 19, 2010 and Account Activity Statements for the period of February 26, 2010 through December 31, 2010. The month-to-month balance is not provided for the Account Activity Statements covering the period of February 26, 2010 through December-

ber 31, 2010. The balance at the time these printouts were created was $2,474.06.

**3.** The Zybron Optical Accounts included four accounts, but, as of October 1, 2008, with the exception of a de minimus balance in the "business share account," all the funds were in the money market account or the checking account (Pl. Exh. 10, pp. 1–2).

tion date, March 6, 2009, the accounts had about $30,000 (Pl. Exh. 22; Pl. Exh. 10, pp. 13–14) ($26,643.73 in the Business Money Market Account; $41.46 in the Business Share Account; and $3,193.46 in the Business Basic Checking Account). By the conversion date, October 2, 2009, the accounts had less than $1,000 (Pl. Exhs. 10 & 22). These accounts showed Zhang received $66,500 in prepetition funds which Zhang identified as "salary" between November 20, 2008 and February 13, 2009 (Pl. Exh. 23).

The Zybron Optical bank accounts were used to pay personal expenses of Zhang (or that of his household), both prior to and during his bankruptcy case, and these bank accounts went from a balance of $240,009.76 as of October 1, 2008 to $2,063.30 as of May 1, 2009 (Pl. Exhs. 10 & 22). On March 10 and April 10, 2009, after the petition date, Zhang wrote checks, each in the amount of $1,734.09, to Chase from the Wright–Patt Credit Union Zybron Optical account to make the mortgage payment on his residence (Tr., p. 25 and Pl. Ex. 10, pp. 14 & 16). The only evidence available leads to the conclusion that the expenditures from these accounts were for household expenses or other purchases for the personal use of Zhang and Wu.

### E. *Zhang's and Wu's Employment History and Sources of Funds*

The evidence creates a murky picture of Zhang's employment history over the last few years prior to his filing bankruptcy and during the pendency of his case. For instance, as mentioned, the Zybron Optical accounts showed Zhang received $66,500

prepetition from those accounts between November 20, 2008 and February 13, 2009 which Zhang identified as "salary" (Pl. Exh. 23). These figures averaged over $16,000 in gross income each month. However, Zhang's original Schedule I, filed with the petition on March 6, 2009, showed that Zhang had gross monthly wages of only $2,600 from his employment with Zybron Optical (Pl. Exh. 1). Zhang explained this discrepancy by stating that the income on Schedule I reflected anticipated future income, not historical prepetition income (Tr., pp. 85–86). However, Zhang's Official Form 22C, which represents his current monthly income, a prepetition average of his actual six months of income prior to the petition date,[4] also showed the same $2,600 figure (Pl. Exh. 1, p. 46).

Zhang's Amended Schedule I, filed on January 29, 2010 (estate doc. 91), shows his gross income was only $1,700 from social security and income generated from real property. The Amended Schedule I states that the "Debtor retired at the end of December 2009; government contract that the company he worked for which is owned by Debtor's spouse expires on or about February 1, 2010 (but could possibly be extended by the government for a short period of time, perhaps up to two months.)." He testified that, as of January 1, 2010, he was retired and doing volunteer military defense research work only (Tr., p. 73; Schedule I).

Zhang also received some miscellaneous distributions from the Zybron Optical accounts in 2010, including $3,000 on August 16, 2010, $1,000 on August 27, 2010, and

---

**4.** The definition of "current monthly income" [11 U.S.C. § 101(10A)] contains certain exclusions, but nothing in evidence explained the vast discrepancy between the prepetition income Zhang received and the amount listed on his Official Form 22C. Zhang identified all the relevant transfers as "salary." *See* Exh. 23. Form 22C, as filed, was materially wrong. During the meeting of creditors Zhang testified he reviewed it carefully, but claimed ignorance of the document at trial.

$5,000 on October 5, 2010 (Tr., p. 74; Pl. Exh. 8). He did not list any of these amounts on his 2010 federal income tax return (Pl. Exh. 8). He testified that these withdrawals were for the repayment of loans or funds Zhang borrowed from unnamed relatives so that he could pay his mortgage (Tr. pp. 116–17), but no documentation of any of these loans was provided to the UST, although Zhang testified that some documentation existed. Tr., p. 125.

Both Zhang's original Schedule I and his amended Schedule I reflect that Wu, as senior officer of Zybron Optical, had monthly gross wages of $8,060.

F. *Dan Joint Venture Judgment and the Transfer of Funds for Payment of the Settlement with Dan Joint Venture and Restitution Paid Through the California United States District Court*

As of October 1, 2008 the Zybron Optical accounts had $240,009.76 (Pl. Exh. 22). On September 30, 2008, just prior to the DAN judgment being entered, $40,000 was transferred from the Zybron Optical accounts, for which Zhang was a signatory, to Zhang's Ameritrade IRA account (Tr., p. 27). In addition, two $10,000 transfers were made from the Zybron Optical accounts to the IRA account by wire transfer on October 9 and 10, 2008 (Tr., p. 28; Pl. Exh. 11, pp. 2).

The parties stipulated that the Montgomery County, Ohio, Court of Common Pleas entered a judgment on October 22, 2008 in the principal amount of $296,303.16, plus $4,966.35 in unpaid interest and $304.75 in fees, with interest and fees continuing to accrue from August 16, 2008, against Zhang in favor of DAN, a collection vehicle of Fifth Third Bank (Pl. Exh. 5; Exh. E).

On October 29, 2008, a week after the DAN judgment was entered, $99,500 was transferred from the Zybron Optical account to an Eyztek account, with Eyztek being solely owned by Wu and having only been formed as a corporation in the prior month. *See* Pl. Exh. 10, p. 2. Zhang explained that Eyztek borrowed the $99,500 because Zybron Optical was paid for an Air Force contract it received in 2007 and an Army contract it received in 2008. Zhang testified that Eyztek used the funds to develop new technology concerning LED traffic lights for commercial application. Tr., p. 116.

A complaint objecting to the dischargeability of the DAN Fifth Third debt was filed by DAN on March 23, 2010 and settled in principle as of June 15, 2010 (Adv. No. 10–3102; docket entry of June 15, 2010) and dismissed on August 30, 2010 (Adv. No. 10–3102; Doc. 5). During the trial of this adversary proceeding the settlement amount was represented to be $35,000, although the specifics of the settlement are not of record on the court's docket. Zhang testified that on April 14, 2010 $20,000 was withdrawn and on August 3, 2010 $15,000 was withdrawn from the Ameritrade IRA Account (Pl. Exh. 9, pp. 62 & 69), with these amounts later being deposited in his personal account (Pl. Exh. 8, p. 38; Pl. Exh. 10, p. 56). Zhang conceded that the $35,000 was used to pay the settlement with DAN.

On April 21, 2010, another $20,000 was deposited in Zhang's personal account with Wright–Patt (Pl. Exh. 8, p. 38). Then in May 2010 $20,100 was withdrawn from his personal account to issue a cashier's check payable to the Clerk of the United States District Court in California (*Id.* at p. 40) to pay restitution related to his criminal sentence, which is discussed below.

### G. *Inconsistent Statements Concerning Military Contracts*

On April 5, 2010 Zhang pled guilty to the offense of Exporting National Security Controlled Items without a License in the United States District Court for the Central District of California. Zhang was sentenced to probation for three years (Pl. Exh. 17). One condition of probation was that he "not engage, as whole or partial owner, employee or otherwise, in any business involving the exporting of Department of Commerce export-controlled items without the express approval of the Probation Officer prior to engagement in such employment. Further, [Zhang] shall provide the Probation Officer with access to any or all business records, client lists and other records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer[.]" *Id.*

In September 2010 Zhang sent a letter[5] to District Court Judge Walter to avoid staying six months in a community corrections center, a condition of his probation (Pl. Exh. 19). Zhang stated that:

> Currently we have a procurement contract from the Navy for standoff explosive detection ... and a Phase–II contract from the Air Force to measure the payment hardness and stiffness and see the defects underneath the pavements of runway, highway and bridge with 70 miles per hour speed.... In addition, we will also get a contract from the home land security on 1/2/2011 for the development of a in-situ latent fingerprint detection system.... I am the Principal Investigator and the proposed author for all these researches [sic] and have the biggest responsibility for the successful completion of these projects.

After finishing the community service I do research at home until middle night every day.... If I go to the correction center I cannot use computer, internet and reference books, the progress of these urgent researches [sic] will be delayed because I am the key person—PI.

However, in his October 18, 2010 deposition Zhang was asked "Does [Eyztek] continue to get contracts?," Zhang answered "No. Currently no. In the future, I don't know." (Pl. Exh. 2, p. 31). *See also* Debtor Exh. C (May 2009 contract between a unit of the Navy and Eyztek).

### H. *The Testimony of Peter Sergakis*

Peter Sergakis ("Sergakis"), a certified public accountant and bankruptcy analyst for the UST, testified regarding Zhang's finances and those of Zybron, Zybron Optical and Eyztek. As a business accounting expert, Sergakis testified that he could not rely on the veracity of the tax returns he reviewed for Zhang or any of the corporations because the information could not be verified (Tr., p. 19).

Sergakis also testified that the intercompany transfers between Zybron, Zybron Optical, and Eyztek did not make sense from an accounting perspective. He stated that, beyond this case, in his entire career he never saw intercompany transfers labeled as "loans" when the account balances for the various corporations did not demonstrate that they needed loans. He also testified that the commingling between the various entity bank accounts had no discernable business purpose (Tr., pp. 36–37). In addition, Sergakis stated that a clear record was never provided as to which contracts applied to which company (Tr., p. 21). Finally, he indicated that

---

**5.** The October 17, 2010 date on the letter was erroneous since it was file-stamped in the District Court in September 2010.

the payment of personal expenses from business accounts should have been treated as income to Zhang which was never reported on his personal income tax returns (Tr., p. 22). The court found Sergakis' testimony credible as to the overall structure of Zhang's finances.

## III. Conclusions of Law

### A. *Jurisdiction and Venue*

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). The court has venue over this proceeding pursuant to 28 U.S.C. § 1409(a). Neither the jurisdiction of this nor the venue for the adversary proceeding have been disputed.

### B. *Denial of Discharge Generally*

■■■ A plaintiff bears the burden of proof in an adversary proceeding seeking to deny the debtor a discharge. Fed. R. Bankr.P. 4005. The burden of proof is by a preponderance of the evidence. *Barclays/Amer. Bus. Credit v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir.1994), *relying on Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (burden of proof for plaintiff in a dischargeability proceeding under 11 U.S.C. § 523 is by a preponderance of the evidence). Denial of a discharge is an extreme remedy and, therefore, exceptions to a debtor's discharge under § 727(a) are to be construed liberally in favor of the debtor. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 736 (Bankr.S.D.Ohio 2008); and *Ker v. Ker (In re Ker)*, 365 B.R. 807, 812 (Bankr.S.D.Ohio 2007) ("In order to afford the honest but unfortunate debtor a fresh start, the Court narrowly construes exceptions to discharge.").

### C. *Section 727(a)(2)(A) and (B)*

Section 727(a)(2)(A) provides that the court shall grant the debtor a discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody or property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." This exception to discharge "is to be liberally construed in favor of the debtor, and the party objecting to discharge bears the burden of proof by a preponderance of the evidence." *Buckeye Retirement Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 653 (6th Cir. BAP 2008), *citing Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000). Section 727(a)(2)(B) applies the same standard as subsection (A) to actions taken post-petition against property of the estate. Thus, subsection (a)(2)(A) addresses prepetition conduct of the debtor taken to conceal or keep assets from the debtor's creditors or a bankruptcy trustee, while subsection (a)(2)(B) addresses post-petition conduct taken by the debtor to conceal, destroy, damage, transfer or keep assets from creditors or a bankruptcy trustee.

■■■ Section (a)(2) has two elements: a) conduct taken by the debtor relating to the disposition or concealment of property of the debtor; and b) a subjective intent to hinder delay or defraud a creditor or the bankruptcy trustee through that conduct. *Keeney*, 227 F.3d at 683. Concealment has been interpreted to include "the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known." *Swegan*, 383 B.R. at 655.

■■■ Because the required intent is rarely admitted, circumstantial evidence of

fraud is often used to establish the requisite intent under § 727(a)(2)(A) and (B). Badges or indicia of a fraudulent intent include (1) concealment of prebankruptcy conversions; (2) conversion of assets immediately prior to filing bankruptcy; (3) gratuitous transfers of property; (4) continued use by the debtor of transferred property; (5) transfers of property to family members; (6) obtaining credit to purchase exempt property; (7) conveyance of property following the entering of a large judgment against the debtor; (8) a pattern of "sharp dealing" prior to bankruptcy; and (9) conveyances of property rendering the debtor insolvent. *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073,1077 (10th Cir.1991) (the "*Marine Midland* factors"). *See also Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 236 (Bankr.E.D.Tenn.2010) (listing badges of fraud that could help establish fraudulent intent) (the "*Flemings* factors"). In analyzing these or other indicia, the courts take into consideration the monetary value of the converted assets. *Carey*, 938 F.2d at 1077, *citing Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871, 876 (8th Cir.1988).

1. *Adams* and the Alter Ego and Reverse Veil Piercing Theories As Relate To Concealment and Transfers Under § 727(a)

In determining whether individual debtors have concealed or transferred property in violation of § 727(a)(2) or made a false oath or account under (a)(4), courts have frequently applied or borrowed from alter ego and reverse veil piercing theories. These courts have recognized that in the context of Bankruptcy Code § 727(a)(2) and (4), corporate distinctions may be dis-

regarded under alter ego and reverse veil piercing theories and the assets of those entities, particularly bank accounts, be treated as the assets of the debtor when the facts warrant the application of those theories. Similarly, in *Adams*[6] the Sixth Circuit affirmed the bankruptcy court's treatment of a corporation's accounts receivable as the funds of the individual debtors because the debtors "controlled" the corporation. Thus, the court will examine those principles and the facts of this case to determine whether any of those principles should be applied.

In *Adams* the individual debtors were principals of a Chapter 11 corporate debtor, Adams Plywood. In violation of the company's receivables' financing arrangement with its lender, the Adamses diverted the company's accounts receivable into the company's operating account rather than a segregated lock box established to receive those receivables and used cash collateral without authorization. The lender contested the Adams' discharges in their individual Chapter 7 case. In affirming the bankruptcy and district courts' denial of the debtors' discharges, the Sixth Circuit held that the bankruptcy court "correctly characterized the Adams Plywood accounts receivable as 'property of the debtor,' under Section 727(a), because Edsel Adams controlled Adams Plywood." The Court further explained that Adams Plywood was an insider of Edsel Adams because it was wholly owned by and controlled by Mr. Adams.[7] The Court, therefore, concluded that the bankruptcy court was correct in denying the discharges because § 727(a)(7) provides for the denial of a debtor's discharge when the debtor has hindered, delayed, or defrauded a creditor of an entity that is an insider of the debtor or if the

---

6. *Barclays/Amer. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994).

7. *See* 11 U.S.C. § 101(31)(A)(iv).

debtor has otherwise engaged in an act with respect to that entity's property that would be nondischargeable under § 727(a)(2)—(6) if the debtor committed that act with respect to his own property. *See* § 727(a)(7).

The theory under which the Sixth Circuit affirmed the bankruptcy court in *Adams* is similar to courts' application of the alter ego and reverse veil piercing concepts under § 727(a)(2) and (4). In the following cases bankruptcy courts applied alter ego or reverse veil piercing principles to find that the debtors through the use of the corporate fiction concealed or transferred property in violation of § 727(a)(2): *Doubet, LLC v. Palermo (In re Palermo)*, 370 B.R. 599, 613–14 (Bankr.S.D.N.Y.2007) ("By orchestrating complex fee arrangements between his various alter ego entities, Palermo acted with the requisite intent to hinder creditors by taking cash advances on his future earnings, assigning his payments to those lenders in repayment, transferring his property between accounts, and squandering the balances."); *Neary v. Mosher (In re Mosher)*, 417 B.R. 772, 780 (Bankr.N.D.Ill.2009) (corporate entity disregarded using alter ego or reverse veil piercing "based on the way the debtor used the entity"—considering such factors as the debtor being the sole shareholder, using his home address for the entity, regularly commingling his own funds with those of the entity, regularly using funds of the entity for his own personal use, using the entity for his own personal benefit rather than acting in the best interest of the entity, and failure to follow corporate formalities); and *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 918–19 (Bankr.D.Utah 2006), *aff'd* 359 B.R. 356, 2007 WL 866660 (10th Cir. BAP March 19, 2007) (corporate entity disregarded when the sole shareholder of the entity was the daughter of the debtors and was the owner of the entity in name only, debtors controlled the entity, the entity was established nine days after the debtors were sued in state court, the debtors used the entity "as their own personal pocketbook," the debtors and the entity engaged in extensive commingling of personal and business funds, and substantially all of the entity's income "ended up in various other bank accounts"). *See also Compton v. Bonham (In re Bonham)*, 224 B.R. 114, 115–17 (Bankr.D.Alaska 1998); and *In re Gherman*, 103 B.R. 326, 331(Bankr.S.D.Fla.1989).

■■■ Sixth Circuit and Ohio law recognize the alter ego theory to disregard the corporate fiction, but not reverse veil piercing principles. In *Brennan v. Slone (In re Fisher)*,[8] the Sixth Circuit addressed both the doctrines of reverse piercing of the corporate veil and alter ego, rejecting the reverse piercing theory but affirming this court's finding that a corporation was the alter ego of its sole shareholder. *Fisher*, 296 Fed.Appx. at 507, 2008 WL 4569946, at *31.[9] In dis-

---

**8.** 296 Fed.Appx. 494, 506, 2008 WL 4569946 (6th Cir.2008).

**9.** The doctrine of "reverse piercing of the corporate veil" is a remedial theory or principle used by creditors or those who may stand in the shoes of creditors, such as a bankruptcy trustee, to reach the assets of a legal entity owned by or in which the debtor holds an interest. Under the traditional piercing of the corporate veil theory, the debtor is a legal entity and the creditors of the legal entity seek to reach the assets of the owner or principal of the entity. *See Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993); *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 895 N.E.2d 538 (2008). By contrast with the *Belvedere* test, under the theory of reverse piercing of the corporate veil, the creditors or trustee seek to reach the assets of a legal entity in which the debtor holds an interest. As determined in *Fisher*, Ohio

cussing that issue, the Sixth Circuit concluded that veil piercing and alter ego concepts are distinct theories. The panel stated that:

> Defendants argue that the bankruptcy court improperly applied reverse-piercing of the corporate veil, which has not been recognized in Ohio. To be sure, the Ohio courts have not adopted reverse-piercing, despite acknowledging that it has been permitted by other courts in limited cases where the corporation was found to be the alter ego of its controlling shareholders and a creditor was seeking assets of the corporation to satisfy the debts of the controlling alter ego. *Geiger v. King*, 158 Ohio App.3d 288, 2004 Ohio 4227, 815 N.E.2d 683, 685 (Ohio Ct.App.2004). This court has explained, however, that veil piercing and alter ego concepts are distinct. The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct. *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th Cir.2005). Here, the bankruptcy court found that because Fisher and FDP were the same entity, FDP's inventory belonged to Fisher such that the transfer to Brennan was a transfer of an interest in property of the debtor.

*Fisher*, 296 Fed.Appx. at 506, 2008 WL 4569946, at *27–28. *See also United States v. Toler*, 666 F.Supp.2d 872, 886 (S.D.Ohio 2009) ("Given the recent decision by the Sixth Circuit on this very point of law, and because no subsequent decisions have questioned the analysis in *In re Fisher*, this Court finds that Ohio law does

recognize alter ego doctrine as distinct from veil piercing.").

In *Fisher* the Sixth Circuit outlined the following as factors (the "*Fisher* factors") to be considered in determining an alter ego claim:

> In Ohio, the courts may consider a number of nonexclusive factors in deciding whether to disregard the corporate fiction under the alter ego theory. Those factors include: "(1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005); *see also Carter–Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir.2001).

*Fisher*, 296 Fed.Appx. at 506, 2008 WL 4569946, at *28–29. In *Toler* the District Court stated:

> In applying the alter ego test, not all of the seven factors must be met. In *Pottschmidt*, the court held that in order to satisfy the requirements of alter ego doctrine "a plaintiff must prove that the individual and the corporation are fundamentally indistinguishable." *Pottschmidt*, 169 Ohio App.3d at 836, 865 N.E.2d 111 (internal citations omitted). The *Pottschmidt* court referenced only

courts have not adopted the concept of reverse piercing of the corporate veil, 296 Fed. Appx. 494, 506, 2008 WL 4569946, at *28 (6th Cir.2008). *See also Winston v. Leak*, 159 F.Supp.2d 1012, 1018 (S.D.Ohio 2001) (reverse piercing not recognized in Ohio); *Geiger*

*v. King*, 158 Ohio App.3d 288, 815 N.E.2d 683, 686 (2004) (Ohio has not adopted the doctrine of reverse corporate veil piercing); *Mathias v. Rosser*, 2002 WL 1066937, at *6 (Ohio Ct.App. May 30, 2002) (similar).

four factors in determining that the alter ego test had been met: "1) whether corporate formalities were observed; 2) whether corporate records were kept; 3) whether corporate funds were commingled with personal funds; and 4) whether corporate property was used for personal use." *Id.* (citing to *LeRoux's* [*Billyle Supper Club v. Ma*], 77 Ohio App.3d at 422, 602 N.E.2d 685 [(1991)], which outlines the seven factors adopted by In re Fisher).

*Toler*, 666 F.Supp.2d 872, 887. The *Toler* court also noted that:

> Similarly, in *Taylor Steel*, the Sixth Circuit found that even where none of the factors had been found, a corporation was still the alter ego for its sole shareholder. 417 F.3d at 606; *see also Petro v. Mercomp*, 167 Ohio App.3d 64, 71, 2006 Ohio 2729, 853 N.E.2d 1193 (Ohio Ct.App.2006) (granting summary judgment even where the only factor considered for alter ego prong in piercing the corporate veil was that defendant was sole shareholder of corporation).

*Id.* at 887, n. 14.

■■■ Application of alter ego principles to § 727(a) jurisprudence is an extension of the age old maxim of law that "equity regards substance rather than form." Bankruptcy courts, as courts of equity or otherwise using their equitable powers, may look through the form to the substance. *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir.1991); *In re Koliba*, 338 B.R. 39, 42 (Bankr.N.D.Ohio 2006) (both relying on *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 436 (6th Cir.1982)). Thus, bankruptcy courts have applied these same concepts outside the corporate fiction scenario when debtors have placed assets under the name or custody of other people:

> Distinctions between a bankrupt debtor's legal title (or rights) and those of a separate individual or entity have "been found to be unavailing when the debtor is shown to have had an *equitable* interest in property held nominally by a third party." Courts have found an equitable interest where a debtor transfers or allows a third party to assume legal title under "suspicious circumstances ... 'such as after a debtor has suffered a money judgment or otherwise is under financial pressure, but nevertheless retains attributes of beneficial ownership.'" "Numerous courts have found that debtors who transferred all of their salary, or their right to receive salary, to a family member or to a corporation owned by a family member, yet retained the benefits of such salary ... should be denied discharge."

*Rotella & Associates v. Bellassai (In re Bellassai)*, 451 B.R. 594, 600 (Bankr. S.D.Fla.2011) (citations omitted) (denying the debtor's discharge under § 727(a)(2)(A) under circumstances in which the debtor concealed his equitable interest in a company with the intent to hinder, delay, and defraud his creditors). *See also Warren v. Rowland (In re Rowland)*, 441 B.R. 281, 286 (Bankr.S.D.Ohio 2010) (debtor's transfer of operations of business entity, including control of funds, to an entity established by the debtor's wife two weeks before filing bankruptcy violated § 727(a)(2) and (4)).

The court will now analyze specific transactions and assets questioned by the UST within this framework.

2. Transfer of the $99,500 from the Zybron Optical Bank Accounts to Eyztek

■■■ The chronology of events and the testimony surrounding Eyztek all demonstrate that the formation of the corporation may have allowed Wu to own her own corporation, but it also allowed Zhang to ultimately hide cash from DAN. First,

Eyztek was formed almost immediately after the DAN judgment was entered against him. As noted, although Wu was its sole shareholder, the corporation used Zhang's initials. (The corporation formation documents list the company as "EYZtek.") (Pl. Exh. 14, p. 7). Second, $99,500 was transferred to Eyztek immediately after its formation from Zybron Optical. Eyztek provided no consideration for the transfer and the funds were transferred from a corporation owned in part by Zhang (Zybron Optical) to one solely owned by Wu (Eyztek).

The court concludes that these transfers were primarily made to hide cash following the DAN judgment by placing it in corporate accounts of a corporation in which Zhang owned no equity, making it difficult for DAN to reach. The court concludes that the decision to transfer the funds from Zybron Optical to Eyztek was made by Zhang. Zhang controlled the Zybron Optical bank accounts as a signatory and used them as his personal accounts. *See Adams*, 31 F.3d 389. If Zybron Optical was operating in its own corporate best interest, a gratuitous transfer to an unrelated corporation serves no legitimate business purpose. Sergakis aptly made this point as to many of the transfers and his testimony was never persuasively rebutted.

Zhang testified that these funds were a return of undocumented loans which Wu previously made to Zybron Optical and were transferred to Eyztek to invest in new LED traffic lights (Tr. p. 127). The court is unconvinced those were the primary motives for the transfer of the funds and for the formation of Eyztek. The temporal proximity to the DAN judgment, the lack of consideration, and the lack of documentation of any loan (like all the loans referenced at trial), all suggest that the formation of Eyztek and the transfer

of the $99,500 to it were undertaken to evade the DAN judgment. The transfer was made within a year of the petition date, shortly after a large judgment was entered against Zhang, the amount of funds was significant, and the explanation provided by Zhang is uncorroborated by any independent evidence. The Zybron Optical accounts were under the control of Zhang and the funds in those accounts were routinely used as his personal funds.

Accordingly, analyzing the *Marine Midland, Flemings*, and *Fisher* factors, *Adams* and other equitable principles used by courts in assessing a debtor's intent in making a specific transfer, the court finds that the transfer of the $99,500 justifies the denial of Zhang's discharge under § 727(a)(2)(A) as an attempt to hinder or delay DAN in the collection of its judgment.

3. Transfer of the $60,000 to Zhang's Personal IRA Account

In September 2008 Zhang transferred $60,000 from the Zybron Optical bank accounts he controlled to his personal IRA account. The court finds these transfers were designed to conceal Zhang's assets and to transfer them into the IRA account in the hope that they would be beyond the reach of DAN. The transfers were gratuitous for Zhang's benefit, were made contemporaneously with the DAN judgment, and were transfers of significant monetary value. The court does not find any legitimate business or other purpose for transferring these funds to Zhang's personal IRA account.

Accordingly, again analyzing the *Marine Midland, Flemings*, and *Fisher* factors, *Adams* and other equitable principles used by courts in assessing a debtor's intent in making a specific transfer, the court finds that the transfer of the $60,000 to Zhang's IRA account justifies the denial of Zhang's discharge under § 727(a)(2)(A) as an at-

tempt to hinder or delay DAN in the collection of its judgment.

### 4. Concealment of the Zybron Optical Bank Funds

 The retention of the funds in the Zybron Optical bank accounts and the use of these funds for personal and family household purposes establish that these funds were Zhang's personal funds that were intentionally concealed from DAN and his other creditors and from the Chapter 7 trustee through the subterfuge of maintaining them in the Zybron Optical accounts and failure to disclose the funds on his bankruptcy schedules. Because Zhang controlled Zybron Optical and the Zybron Optical bank accounts, the funds in those accounts were his funds and, thus, were property of his estate. Zhang never explained the many debit card and ATM charges made against both the Zybron Optical accounts that served no apparent business purpose and plainly appear to be for personal, household expenses. *See* Pl. Exh. 10.

Despite not being a director or officer and only being a minority shareholder of Zybron Optical, Zhang was a signatory on all of the Zybron Optical bank accounts (Tr., p. 75). The Zybron Optical bank accounts, like the Zybron bank accounts, were also used to pay personal expenses of Zhang (or that of his household). These bank accounts went from a balance of $240,009.76 on October 1, 2008 to $2,063.30 on May 1, 2009 (Pl. Exh. 10), with Zhang's bankruptcy intervening on March 6, 2009. On the petition date the accounts held approximately $30,000. On March 10 and April 10, 2009, after the petition date, Zhang wrote checks, each in the amount of $1,734.09, to Chase from the Wright–Patt Credit Union Zybron Optical account to make the mortgage payment on his residence. (Tr., p. 25 and Pl. Ex. 10, pp. 14 & 16). The only evidence available leads to the conclusion that the expenditures from these accounts were for household expenses or other purchases for the personal use of Zhang and Ms. Wu.[10]

Thus, applying the *Marine Midland, Flemings,* and *Fisher* factors, *Adams* and other equitable principles applicable to making a § 727(a)(2) determination, the court finds that Zhang's retention of the funds in the Zybron Optical bank accounts and failure to schedule those accounts constitute the concealment of those accounts and those funds from DAN and the Chapter 7 trustee made with the intent to hinder, delay, or defraud DAN in the collection of its debt and with the intent to hinder, delay, or defraud the Chapter 7 trustee in the performance of his duties warranting denial of Zhang's discharge under § 727(a)(2)(A). *See Johnson v. Bal-*

---

**10.** Many of the same issues arise with respect to the Zybron accounts; however, as noted, the bank statements for the Zybron accounts do not cover any period prior to October 1, 2009 and there was no evidence regarding whether those accounts were in existence on the petition date or with respect to any other issues pertaining to those accounts at the time Zhang's bankruptcy petition was filed. There was no apparent business purpose for maintaining bank accounts in the name of Zybron, since according to Zhang's testimony and Zhang's Statement of Financial Affairs (Pl. Exh. 1), Zybron ceased operating in 2005. His Schedule B reflects that shares of stock were never issued for Zybron. Zhang personally controlled the Zybron accounts because he controlled Zybron and used those accounts as his personal property throughout the Chapter 7. Like the Zybron Optical accounts, Zhang never explained the many debit card and ATM charges made against both the Zybron accounts that served no apparent business purpose and plainly appear to be for personal, household expenses. Both Zybron account balances were almost completely dissipated during the pendency of the Chapter 7 for Zhang's personal or family household purposes. *See* Pl. Exh. 11.

*dridge (In re Baldridge)*, 256 B.R. 284, 291–92 (Bankr.E.D.Ark.2000) (failure to disclose a bank account in which the debtor deposits funds and maintaining bank accounts in someone else's name constitute concealment); *Allied Domecq Retailing USA v. Schultz (In re Schultz)*, 2000 WL 575505 (Bankr.N.D.Ohio Apr.21, 2000) (maintaining and concealing account in wife's name constituted concealment resulting in denial of discharge under § 727(a)(2)); *United States v. Craig (In re Craig)*, 252 B.R. 822, 827–28 (Bankr. S.D.Fla.2000) (failure to disclose a bank account in which the debtor deposits funds constitutes a concealment); and *Neary v. Mosher (In re Mosher)*, 417 B.R. 772 (Bankr.N.D.Ill.2009) (discharge denied when debtor hid funds in corporate account used post-petition to pay off a prepetition debt to his brother). Accordingly, the court finds that Zhang's discharge should be denied pursuant to § 727(a)(2)(A) on the basis of Zhang's intentional concealment of his personal funds in the Zybron Optical accounts.[11]

### 5. Concealment of Zhang's Prepetition Income

■ The evidence also reflected a prepetition scheme to conceal Zhang's income. The evidence established that the income generated by all of Zhang's and Wu's entities was primarily the fruit of Zhang's knowledge and skills. While the court does not dispute that Wu contributed to the income generated by those entities, she, at most, provided administrative skills. The evidence showed Zhang's schedules were not accurate as to his prepetition income. Based upon the bank statements discussed above, Zhang earned at least $17,000 each month in salary between October 2008 and January 2009.

However, his Schedule I showed his gross income at only $2,600 each month. Zhang's receipt of $2,600 monthly for his services or the purported donation of his time and efforts through "volunteerism" while Wu took home $8,060.00 monthly was not credible and clearly a scheme to keep Zhang's income from the reach of creditors. *See* estate doc. 1, Schedule I; estate doc. 91, Amended Schedule I. Much of this conduct took place prepetition. Accordingly, the court finds that Zhang's concealment of his income was done so intentionally to hinder, delay, or defraud his creditors, including through the personal use of the funds in the Zybron, Zybron Optical, and Eyztek accounts rather than taking those funds as salary subject to garnishment by creditors. Therefore, Zhang's discharge is denied pursuant to § 727(a)(2)(A) on the basis of his concealing of his prepetition income with the intent to hinder, delay, or defraud his creditors.

### D. Section 727(a)(2)(B)—Postpetition Concealment and Transfer of Funds

■. Having found that the funds in the Zybron Optical accounts at the time of the fling of the bankruptcy case were Zhang's personal funds and therefore property of his bankruptcy estate, the court finds that the transfer to third parties and the use of those funds postpetition, rather than turning them over to the Chapter 7 trustee, constitute the postpetition transfer of those funds for the purpose of hindering, delaying, and defrauding the Chapter 7 trustee charged with administering the property of his bankruptcy estate. In addition, his continued concealment of those funds in the Zybron Optical accounts while

---

11. The Debtor's actions with regard to the Zybron Optical accounts began pre-petition and continued after the petition was filed.

The post-petition acts also warrant a denial of discharge under § 727(a)(2)(B). *See* Section D.

using them to fund his personal expenses constitutes the postpetition concealment of those funds from the Chapter 7 trustee for the purpose of hindering, delaying, and defrauding the Chapter 7 trustee. Thus, Zhang's discharge must also be denied pursuant to § 727(a)(2)(B).

### E. Section 727(a)(4)(A)

Section 727(a)(4)(A) provides an exception to the debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations." *Flemings*, 433 B.R. at 237, *quoting Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990).

To prevail under § 727(a)(4)(A), the UST must show by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Keeney*, 227 F.3d at 685; *Rowland*, 441 B.R. at 286. A statement is material to the bankruptcy case "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Palatine Nat'l Bank of Palatine, Illinois v. Olson*, 916 F.2d 481, 484 (8th Cir.1990).

Statements in bankruptcy schedules and at 341 meetings are given under penalty of perjury. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999); *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 355 (Bankr.E.D.Tenn.2006).[12] Statements during depositions are also under oath. *Id.* Thus, any false statement made by the debtor in the debtor's schedules, at a creditors' meeting held pursuant to § 341, or during a deposition relating to the debtor's assets and financial circumstances could potentially lead to denial of a debtor's discharge under § 727(a)(4)(A) if all of the required elements to establish that exception are proven.

### 1. Failure to Disclose Funds in Zybron Optical Bank Accounts

The evidence established that the funds held in the Zybron Optical bank accounts on the petition date were Zhang's personal funds that should have been disclosed on his Schedule B.

Schedule B, item 1, of the bankruptcy schedules which all debtors must file requires that all of the debtor's "cash on hand" be disclosed. Further, Schedule B, item 2, requires that all of the debtor's "checking, savings or other financial accounts, certificates of deposit" and participation interests in banks and financial institutions be disclosed. Zhang did not disclose the Zybron Optical accounts on Schedule B, which had approximately $30,000 in them on the petition date, nor did he disclose those funds on his schedules. The fact that these accounts were under Zybron Optical's names is of no

---

**12.** A debtor who seeks relief under the Bankruptcy Code must submit schedules reflecting all of the debtor's assets and liabilities, and current income and expenditures. Fed. R. Bankr.P. 1007(b)(1); 11 U.S.C. § 521(a)(1)(B). The debtor must verify "[a]ll petitions, lists, schedules, statements and amendments thereto" or sign them under "an unsworn declaration as provided in 28 U.S.C. § 1746." Fed. R. Bankr.P. 1008. Thus, the schedules and statement of financial affairs were signed by Zhang under penalty of perjury with an affirmation that they were "true and correct to the best of [his] knowledge, information, and belief."

help to Zhang. The evidence established that these accounts were substantially used to fund Zhang's personal expenses. *See* Pl. Exhs. 10 & 11.

Courts have found that the failure to schedule bank accounts used by the debtor for the debtor's own personal use constitute a violation of § 727(a)(4) even when those accounts are in the name of another person. *See Baldridge*, 256 B.R. at 289–90 (failure to schedule bank accounts in wife's name when debtor used his wife's accounts for his personal expenses); and *Roberts v. McVay (In re Roberts)*, 2010 WL 376399, 2010 U.S. Dist. LEXIS 5690 (W.D.Tex. Jan. 25, 2010) (discharge denied when debtors failed to disclose the existence of a bank account which the debtors continued to use to pay personal expenses for more than two years during the pendency of their bankruptcy).

In *Baldridge* the court noted the significance of disclosing bank accounts: "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the details of the debtor's finances. Accordingly, the omission of any and all bank accounts to which the debtor had access constituted a false statement that related materially to the case." *Baldridge*, 256 B.R. at 290.

The substance was that the Zybron Optical bank accounts were Zhang's personal accounts used for his personal expenses. Further, based upon the totality of the evidence introduced, including Zhang's failure to give any business reason for the substantial personal use of the these accounts, the court finds that Zhang knew these were his personal funds and maintained those funds in the Zybron Optical accounts to keep them from his creditors and the bankruptcy trustee and, thus, did

so with a fraudulent intent. Given that these accounts definitely bear a relationship to Zhang's business transactions and the estate, and concern the discovery of assets, business dealings, and the existence and disposition of his property, the failure to disclose these accounts related materially to Zhang's bankruptcy case. As such, his failure to schedule and disclose those accounts and the account balances on Schedule B constituted a false oath for which Zhang's discharge must be denied pursuant to § 727(a)(4)(A).

2. Inaccurate Scheduling of Balance in Bank Accounts in Zhang's Name

The UST has asserted that Zhang's scheduling of the incorrect balance in his Wright–Patt bank account warrants denial of his discharge. However, the court concludes that this error was de minimus and explained by a math error and the failure to account for a deposit close in proximity to the date of the petition and was not the result of concealment or a false oath. The account was scheduled and the explanation of the difference in the balance as scheduled and the actual balance on the petition date was credible.

3. Inaccuracies as to Zhang's Prepetition Income

The evidence showed Zhang's schedules were not accurate as to his prepetition income. Zhang earned at least $17,000 each month in salary between October 2008 and January 2009. However, his Schedule I showed his gross income at only $2,600 each month. Zhang's explanation is that the income listed on Schedule I was a forward-looking number. However, Zhang listed the same figure for his current monthly income, which is based on his prepetition income. Zhang offered no explanation for how any of the exceptions to the definition of current monthly income would account for this discrepancy. All of

the income earned six months prepetition fits within the broad definition of current monthly income. Zhang testified he didn't know much about Form 22C (Tr., p. 126) and, generally, had not read the bankruptcy petition or schedules carefully. However, at his 341 testimony, he testified that he did review his bankruptcy filings carefully and, in any event, he signed them under penalty of perjury.

These documents were material to Zhang's bankruptcy case and would certainly have been considered by creditors or the Chapter 13 trustee in evaluating his plan. The court concludes Zhang, who is not unsophisticated, knew these documents were materially inaccurate and he chose to have his counsel file them anyway. The court does not find credible his testimony that he thought these were "forward-looking" documents. Zhang's failure to list his true prepetition income was a false oath and warrants a denial of his discharge pursuant to § 727(a)(4)(A).

#### 4. False Oaths Concerning Zhang's Post–Conversion Income

Zhang testified that he received no income from military research after his retirement in January 2010, but the bank accounts of Zybron Optical and Zybron were both used for personal expenses on a consistent basis. The use of these accounts to pay for personal expenses was nothing more or less than undisclosed income to Zhang. As noted, this income was never explained adequately by Zhang. Instead, Zhang amended his Schedule I after the conversion to Chapter 7 to show a reduction in income following his bankruptcy filing. The depletion of these accounts over time is completely inconsistent with Zhang's portrayal of being relegated to a fixed income, dependent on relatives for his economic survival. These false oaths warrant a denial of discharge pursuant to § 727(a)(4)(A).

#### 5. Scheduled Value of Zybron and Related Testimony at Creditors' Meeting

The listing of the value of Zybron as "unknown" is, in part, understandable. Zhang noted on Schedule B that obligations of Zybron were exceeded by liabilities and that "three patents and optical lab" had a "subjective estimated value of $400,000." (Pl. Exh. 1, p. 23). Zhang testified that the patents could be worth a million dollars or might have no value. There was no specific evidence as to the liabilities of Zybron. If anything, it put the Trustee and the UST on notice that, if they wished, they could review Zhang's interest in the corporation as to the patents.

However, Zhang never explained that, at the time of conversion of this case to Chapter 7, the Zybron bank account had over $85,000, despite Zybron having ceased operations in 2005 and in Zhang's words having been "dissolved." This account was under the sole control of Zhang and was used for personal expenses as Zhang's alter ego. However, Zhang put parties on notice that his sole ownership of Zybron might have significant value. The lack of disclosure of the funds in the Zybron account is troubling and has been addressed. However, the court finds the overall characterization of Zybron on Schedule B as having unknown value does not constitute a false oath and that, setting aside the "Zybron" bank account, which the court finds to have been Zhang's personal account, Zhang disclosed his ownership interest in Zybron and all of the variables that were applicable in making a determination as to the value of Zybron.

#### 6. Scheduled Value of Zybron Optical and Related Testimony at the Creditors' Meeting

Zhang admitted the value of $100 he placed on Schedule B for Zybron Optical

was inaccurate because it was based on the total price he and Wu paid for the stock in the company. However, the disclosure put parties on notice that, other than some computer equipment and office furniture, the value in Zybron Optical was based on payments to be received from government service contracts. The court finds the UST failed to meet his burden of establishing a false oath based on the value which Zhang placed on Schedule B for his interest in Zybron Optical.

### 7. Unscheduled Prepetition Debts to Family Members

■ Zhang failed to schedule debts of approximately $100,000 from family members (Pl. Exh. 1). This omission was false and materially related to his bankruptcy case and Zhang never amended his schedules to correct the error. In some instances, this failure would suggest fraudulent intent. *See The Cadle Co. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328, 352 (Bankr.M.D.Fla.2002) (failure to promptly amend schedules may show fraud). Such a significant omission is not trivial and reflects—consistent with his testimony— that Zhang did not review his schedules carefully. However, nothing in the record suggests Zhang or Wu failed to schedule these debts to defraud those family creditors or for other fraudulent purposes. The court finds the failure to disclose these creditors on Schedule F was not a false oath.

### 8. False Oath Concerning Status of Military Contracts

■ Zhang's sworn testimony at his deposition and his meeting of creditors cannot be reconciled with the letter sent to Judge Walter of the United States District Court for the Central District of California. Zhang discussed, in detail, the ongoing military contracts when it suited his purpose of avoiding conditions of his probation. However, to the Chapter 7 Trustee and the UST, he said no such contracts existed. His explanation at trial did not reconcile the contradiction.

Zhang testified that he retired from Zybron Optical and would have no more work as of January 1, 2010 (Tr., p. 37). During Zhang's October 18, 2010 deposition, he was asked "Does [Eyztek] continue to get contracts? A. No. Currently no. In the future, I don't know." (Tr., p. 52–53, Pl. Exh. 2, p. 31). Zhang also testified at his deposition that Zybron Optical had finished all its contracts and had no income (Tr., p. 71–72; Pl. Exh. 4, p. 20). Thus, Zhang conveyed at his deposition that there were no executory or pending contracts for any of the corporations. The court finds that Zhang intended to leave that impression with the UST.

However, in his September 2010 letter to Judge Walter, he specifically references ongoing contracts with the Air Force and the Navy and refers to himself as "the Principal Investigator and the proposed author for all these researches [sic] and have the biggest responsibility for the successful completion of these projects." (Pl. Exh. 19, p. 2). He stated that "the progress of these urgent researches [sic] will be delayed because I am the key person— PI." The contracts are described as "current." Thus, in his letter to Judge Walter, Zhang was making every effort to convince Judge Walter to modify his sentence because his services were needed for the performance of those ongoing contracts.

Regardless of which corporation entered into these contracts with the military, the evidence shows that Zhang was never truly retired and it was his scientific knowledge that was crucial to complete these ongoing military contracts. Zhang deliberately obscured his role with the corporations and denied the pending nature of those contracts during his bankruptcy

when being expressly questioned about such contracts. The testimony he provided at the trial in an attempt to reconcile this testimony (Tr., pp. 86–91) did not succeed and was not credible.

This false testimony was under oath, material to Zhang's bankruptcy case, and made with fraudulent intent to conceal income and obscure Zhang's true financial condition. The testimony at the meeting of creditors and, to an even greater extent, at his deposition, justifies a denial of Zhang's discharge for false oaths pursuant to § 727(a)(4)(A).

F. *The UST Did Not Establish that Zhang's Discharge Should be Denied Pursuant to Section 727(a)(5)*

The UST also requested that Zhang's discharge be denied pursuant to § 727(a)(5), which provides that the debtor's discharge should be denied when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the denial of liabilities." The court finds that the UST did not meet his burden of establishing a basis for denying Zhang's discharge pursuant to that section.

■■■■ Under § 727(a)(5), the party objecting to discharge has the initial burden to prove, by a preponderance of the evidence, that the debtor failed to explain losses or deficiencies of assets that could have been used to pay creditors. *First Nat'l Bank v. Grider (In re Grider)*, 453 B.R. 716, 723 (Bankr.W.D.Ky.2011); *1720 Entm't LLC v. Palmer (In re Palmer)*, 419 B.R. 762, 771 (Bankr.M.D.Tenn.2009). One decision described the assets as having to be "substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy that are no longer available to creditors." *Strzesynski v. Devaul (In re Devaul)*, 318

B.R. 824, 839 (Bankr.N.D.Ohio 2004). The burden then shifts to the debtor who must satisfactorily explain how his conduct was in "good faith and business like." The explanation must be reasonable under the circumstances. *Palmer*, 419 B.R. at 771. If the explanation is convincing and not rebutted, documentary corroboration is not required. *Id.* at 772, *citing Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 97 (Bankr.E.D.N.Y.1997). In evaluating an explanation, "the issue is whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper." *Id.*, quoting *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 550 (Bankr.M.D.Fla. 2000).

■■■■ The court finds the UST did not meet his initial burden of production to establish the loss of significant assets. While Zhang committed false oaths in regard to the status of certain ongoing military contracts, the record did not provide the court with sufficient information regarding the value of the various military contracts of the various corporations, funds received from such contracts, when the funds were received and how Zhang's corporate interests were affected. Nor was the court presented with any significant evidence about assets Zhang may hold in China. The court cannot speculate as to these issues and the UST did not meet his burden of establishing assets that have not been accounted for.

Accordingly, the court finds Zhang's discharge should not be denied pursuant to § 727(a)(5).

G. *The UST Did Not Establish that Zhang's Discharge Should be Denied Pursuant to Section 727(a)(3)*

Near the close of the trial, the court granted the UST's oral motion to conform

the complaint to the evidence to include a count under § 727(a)(3). Section 727(a)(3) provides for the denial of a debtors discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" However, the court finds that the UST also did not meet his burden of establishing a basis for denial of Zhang's discharge pursuant to that section.

Section 727(a)(3) applies a shifting burden of proof. The UST first had to establish a prima facie case showing Zhang failed to keep adequate records. *CM Temporary Svcs. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr.S.D.Ohio 2007). "[T]he Plaintiff is not entitled to perfect, or even necessarily complete, records." *Id.* Zhang needed to provide the UST "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable time past to present." *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (6th Cir. BAP 1999), *quoting Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr.N.D.Ill. 1992). In deciding whether the records produced are sufficient, the court can consider a debtor's education, business experience, sophistication or any other relevant factor. *Strbac*, 235 B.R. at 882. Assuming the UST established a prima a facie case, the burden would then have shifted to Zhang to show the reason for the lack of adequate records. *Id.* at 883; *Noland v. Johnson*, 387 B.R. 728.

The UST argued that Zhang failed to provide the following records:

complete monthly statements of Zhang's Ameritrade IRA account and complete information on all of the bank accounts of Zhang, Eyztek, Zybron, and Zybron Optical. Zhang also referenced loans for which no documentation was provided.

Regarding the Ameritrade IRA account, Zhang provided complete statements for January through October 2009 (Pl. Exh. 9) and also provided account printouts from November 2009 until the end of 2010. Those printouts do include specific references to stock purchases and sales. The court does not find that Zhang's failure to provide complete bank statements for the IRA account following October 2009, while providing printouts of the account activity for that period was a sufficiently significant omission to deny his discharge.

In addition, the UST failed to provide the court with a clear record as to its discovery requests pertaining to other asserted gaps in Zhang's production of documents. For instance, Zhang did not provide documentation of alleged loans to and from Zhang to the various corporations, although apparently such documentation existed. However, whether the UST asked for such loan documentation prior to trial was never established. Further, with respect to the Zybron and Zybron Optical bank account statements, the record reflects that Zhang produced what the UST requested—all bank statements for the period after October 1, 2009 through the "present." *See* Pl. Exh. 2, pp. 40–41.

The court is left with the impression that Zhang, while sophisticated in his scientific education and, to some degree, in business, did not conceal or destroy business records. Zhang's business records, while far from complete, do not justify a determination that Zhang failed to keep or preserve adequate records. It is unclear from the evidence exactly what personal records Zhang kept, which ones were

sought by the UST, and if some of those records were just not introduced at trial. The UST never specified in sufficient detail which documents were denied him or how such documents would have assisted in determining Zhang's overall financial condition. While Sergakis' testimony and other evidence established that the business records were often confusing, inconsistent, incorrectly prepared, and unreliable, the court was left to speculate on which other records the UST needed to ascertain Zhang's complete financial condition and how Zhang's failure to maintain or produce such records affected the UST's ability to analyze Zhang's financial condition. In some instances, the UST may have chosen not to address certain issues.

■ While bankruptcy debtors undoubtedly must fully disclose their financial circumstances to trustees and cooperate with them pursuant to § 521 and Bankruptcy Rule 4002, the plaintiff in discharge litigation still must establish its attempts to obtain specific documents, the debtor's failure to maintain or provide those documents or the debtor's destruction of such documents, and how those specific documents impact an analysis of the debtor's financial condition and transactions before a court can deny the debtor's discharge pursuant to § 727(a)(3). In this case, the failure to introduce such evidence in a more direct and specific manner leads to the conclusion that the UST has failed to meet his initial and ultimate burden to establish a basis for denying Zhang's discharge pursuant to § 727(a)(3).

## IV. Conclusion

Holding interests in business entities or participating in the affairs of business entities should normally have no impact on an individual debtor's discharge. Operating those entities under customary business practices, including payment of business expenses from the funds and accounts of those businesses, while paying a salary or dividends to the shareholders or members commensurate with their services, and otherwise observing proper corporate formalities and functions, should not impact an individual debtor's discharge. However, when a debtor totally disregards the corporate formalities and distinctions between himself and the entities and routinely transfers funds from and between his own personal accounts and those of the entities and between the entities, with the routine payment of personal expenses from the business entities' accounts, and those business entities have more than de minimis funds in their bank accounts, all while the individual debtor has significant personal debt and is taking a reduced or no salary while a spouse is receiving a significant salary in comparison to the spouse's skill and education level, the clear inference is that those accounts and entities are being used to hinder, delay, and defraud creditors.

In this case, based upon Zhang's debts, and particularly the DAN judgment; the timing of the judgment, the transfers, and the bankruptcy filing; and the other evidence in the record, including Zhang's failure to provide credible business justification or explanations for these arrangements, the court finds that Zhang's discharge should be denied under 11 U.S.C. §§ 727(a)(2)(A) and (B) and 727(a)(4)(A). The remainder of the relief sought in the UST's complaint, as amended at trial, is denied. The court will issue a separate order concurrently with this decision.