Charles M. Caldwell, United States Bankruptcy Judge
This Memorandum Opinion and Order serves as the Court's findings of fact and conclusions of law. The United States Trustee (Plaintiff) alleges that Tobias Harold Elsass (Defendant) concealed property and provided false information when filing his bankruptcy case. This pattern continued during the course of administration. Plaintiff seeks denial of Defendant's discharge under Sections 727(a)(2)(A) and (a)(4)(A) of the United States Bankruptcy Code (Code).
Based upon the pleadings, exhibits, and testimony, including credibility assessments, the Court finds and concludes that Plaintiff sustained its burden of proof, and that Defendant is not entitled to receive a bankruptcy discharge. A brief summary of this case and the bases for the ruling follow.
*864 To provide some key background information, Defendant has a long and mixed employment history. His career consists of practicing as an attorney for eighteen years. This included trial, probate and domestic relations work. Defendant's career history also later involves ownership of a construction business, tax return preparation for investment fraud victims, assisting homeowners facing foreclosure, and most recently, the marketing of legalized medical marijuana. In terms of education, Defendant graduated from the Ohio State University in 1976 with a Bachelor of Science Degree in labor law, and three years later graduated from Capital University Law School in 1979.
The Defendant, however, is no novice to the bankruptcy process, filing bankruptcy before on October 13, 2005 (Case No. 05-73544). In that proceeding, Defendant received a Chapter 7 discharge on October 26, 2006, except for a May 15, 2002, Ohio Court of Common Pleas Judgment for $ 92,126.53. This sum included $ 40,000.00 in punitive damages. In the related adversary proceeding (Adv. No. 05-2611), the bankruptcy court issued a default judgment for this sum ($ 92,126.53) on October 31, 2006. According to this Court's docket, the litigation involved fraud in the purchase of real estate while Defendant practiced law. Indeed, the underlying decision of the Common Pleas Court cites as support, three instances in which the Ohio Supreme Court suspended Defendant's law license. (See also Columbus Bar Association v. Elsass , 86 Ohio St. 3d. 195, 713 N.E.2d 421 (1999) ; Columbus Bar Association v. Elsass , 74 Ohio St. 3d. 174, 657 N.E.2d 500 (1995).
In addition to the law practice, Defendant owned, controlled and/or participated in various entities including: a. Don Ash Properties (DAP); b. Sensible Tax Services, Inc. (STS); c. Fraud Recovery Group, Inc. (FRG); d. Fraud Recovery Group Nevada, LLC (FRGN); e. Investment Tax Recovery, Inc. (ITR); f. Save Our Shack, Inc. (SOS); g. Tee Hee Co Inc (THC); h. Starbuds, Inc. (Star); and i. Fairman Services Inc. (Fairman).
Regarding locations, Defendant has participated in businesses in Nevada and Colorado, as well as from his Columbus, Ohio home and an office building in Worthington, Ohio. Defendant even recruited his Son, Donald P. Elsass, who has participated in the management and/or ownership of some of these enterprises. Our focus in this Memorandum Opinion and Order, however, is primarily upon Plaintiff's allegation that Defendant fraudulently concealed and provided false information for his interests in five entities, ITR, SOS, THC, Star and Fairman.
Having concluded our review of the context of this litigation, we now move to consideration of the testimony and numerous documents. Note, that in this endeavor the Court has to the fullest extent possible, placed key events in some semblance of chronological order. However, as an alert, we will be weaving our way through a rather complicated series of enterprises, with as much finesse as time and reason allow.
As such, we begin this discussion with April 2003, when Defendant started working for JK Harris & Company (JKH), located in Florida. Through JKH, Defendant practiced a form of tax law in which he obtained deductions for alleged victims of investment fraud. See 26 U.S.C. § 165(c)(2). Defendant worked for this entity through December 2005. On January 24, 2006, Defendant formed FRG, and through this company Defendant continued *865 the same tax business but based in Ohio. According to Defendant, at its height, FRG controlled 1% of the market share of this tax specialty.
Defendant testified that FRG's scale, however, drew the attention of the Internal Revenue Service (IRS), which first investigated this enterprise in 2007, including the alleged existence of offshore bank accounts. In addition, the success of FRG prompted Defendant's rental of office space in Las Vegas, Nevada in 2009, where he expanded the tax return preparation business to that State through the entity FRGN. Defendant explained a third party earlier formed FRGN, but that he now owns this company. The IRS returned to investigate Defendant sometime that same year (2009). Defendant testified that based upon this examination, the IRS assessed federal income tax on all his bank accounts, including funds held in trust for tax clients.
As a result of this investigatory process, on April 19, 2010, the United States Department of Justice, Tax Division (DOJ), sued Defendant and two of his businesses (FRG and STS). DOJ pursued this litigation in the United States District Court for the Southern District of Ohio, and sought to permanently enjoin Defendant and his businesses in their ongoing tax practice. Three years later on October 17, 2013, the District Court issued a permanent injunction against Defendant personally, as well as the two entities (FRG and STS). This injunction barred future tax work, but allowed continued service to existing clients. A year later on September 12, 2014, this ruling withstood an appellate challenge.
In the midst of this litigation Defendant alleges that he purchased Fairman in 2010. This Oklahoma entity, however, was originally formed on August 28, 2007. Defendant explained that Fairman was a "shell" company, which he purchased for $ 15,000.00. According to Defendant, he needed an established entity to qualify for a bank loan to sustain his tax practice. Two years after the acquisition of Fairman, Defendant formed SOS on November 2, 2012, and owns 100%. It was a marketing business through which Defendant paired Franklin County, Ohio residents facing foreclosure, with attorneys.
After the formation of SOS, Defendant incorporated ITR on January 7, 2013. He took this action to continue the tax practice prior to entry of the District Court injunction discussed above. However, Defendant asserts he transferred ITR a year later in 2014 to his Son, Donald P. Elsass. Yet, records of the Ohio Secretary of State still show Defendant as the registered agent in a document dated July 25, 2017. This fact, along with tax return information discussed below, compromises the credibility of Defendant's testimony regarding the date and/or the existence of an effective transfer of ITR to his Son.
Then two years after the formation of ITR, Defendant incorporated Star on January 12, 2015. Defendant owns 100% of this company, and he created Star to become involved in Ohio's movement to legalize medical marijuana. Closely associated with Star, Defendant next incorporated THC on July 20, 2015. It is as an indoor gardening business for legalized medical marijuana.
Finally, after our best attempt to navigate this maze of enterprises, we reach an exit point and the most portentous date for Defendant. Namely, for the second time Defendant arrives on the doorsteps of this Court on November 2, 2016. On that date he filed this current Chapter 7 bankruptcy proceeding. This was done without counsel, *866 including the Petition, Schedules, and Statement of Financial Affairs (SOFA). Defendant signed and filed all these documents under penalty of perjury. Regarding business entities, however, Defendant disclosed only that he had 100% percent interests in FRG and FRGN, and that they both had no value. At best, this lapse is baffling, and at worst, it severely undermines Defendant's credibility.
According to Defendant's sworn representations at the time of filing, his assets totaled $ 269,900.00, compared to liabilities of $ 2,119,301.11. His property included a home, two automobiles, miscellaneous household goods, furnishings and clothing, a cat, and a Fifth Third Bank checking account with $ 500.00. Defendant scheduled the IRS as having a secured claim of $ 957,303.82. Indeed, it is the single largest creditor. As a result, the primary impact of this bankruptcy filing has been to delay IRS collection efforts, for more than two years.
Regarding income, Defendant initially disclosed monthly earnings of $ 2,413.00 compared to expenses of $ 5,020.00, leaving a deficit of -$ 2,827.00. Defendant declared that his monthly income derived from tax work performed on behalf of FRG ($ 1,000.00), and Social Security ($ 1,413.00). In the initial SOFA, Defendant disclosed business income for 2014 ($ 12,000.00), 2015 ($ 8,000.00) and 2016 ($ 10,000.00). He also listed 2016 year to date income from Social Security of $ 11,448.00. Defendant in addition listed on the SOFA that he performed "specialized tax work" through FRG that existed from January 1, 2005, to June 1, 2012, and FRGN that existed from August 1, 2009, to June 1, 2012.
What on its face may seem to be a routine Chapter 7 case, however, soon morphs into some far more complicated species. Specifically, on December 23, 2016, Defendant attended the meeting of creditors as required by Section 341 of the Code, and he testified under oath. Representatives of the United States Trustee's Office and tax counsel for DOJ attended fully armed, and both questioned Defendant vigorously.
Among other inquiries, the equally prepared Chapter 7 Trustee asked Defendant whether he listed all of his assets. Defendant said yes. But, Defendant later admitted during the meeting that he currently and/or previously owned the five other entities involved in this litigation. Not far behind this reveal, on February 9, 2017, Plaintiff filed the current adversary proceeding. Then on April 12, 2017, five months after the petition date and four months after the creditors' meeting, Defendant finally amended his Schedules and SOFA to conform to what he now represents as true and accurate disclosure.
This all proved quite telling. For example, on the Amended Schedules Defendant disclosed an additional bank account with Comerica Bank ($ 300.00), and added ownership interests in the five additional entities at issue. For Fairman, Star and THC, Defendant disclosed a 100% ownership interest, ten percent for SOS, and zero percent for ITR. He valued Star at $ 100,000.00 and SOS at $ 1,000.00. On the topic of income, Defendant added sources, other than just FRG and Social Security, as disclosed in the original filing. The additions included "self-employment" at $ 1,375.00 per month not designated to an entity, "real estate" for SOS, "Consulting" for Star, both with no amounts provided, and finally "Divorce Consulting" not assigned to an entity, and without any amount.
*867 Regarding the Amended SOFA also filed on April 12, 2017, Defendant included the five additional entities, ITR, SOS THC, Fairman, and Star, along with their dates of operations. In terms of year to date total income, the amounts between the Original and Amended SOFA increased for 2014 ($ 12,000.00 to $ 73,465.00), 2015 ($ 8,000.00 to $ 8,462.00), and 2016 ($ 10,000.00 to $ 16,446.00). The Amended SOFA listed four additional bank accounts at JPMorgan Chase & Co., designated as closed, including one with $ 18.00 closed on April 30, 2016, and one with $ 8.00 closed on June 30, 2016. Defendant listed two other JPMorgan Chase checking accounts with zero balances, but without any closing dates.
Other new information on the Amended SOFA included Defendant's sale of a 2008 Honda Pilot automobile for $ 8,000.00 to a "Kulsharee Garcia" from Washington, D.C. on August 1, 2016. Along with this information, Defendant disclosed additional data regarding his purchase of a 2016 Toyota Highlander on September 1, 2016, for $ 42,493.86, notably with $ 6,000.00 down. Defendant added previously unscheduled gifts, including to Faith Mission ($ 400.00 on November 15, 2015, and $ 400.00 on June 6, 2016). Defendant also listed a gift of $ 1,000.00 dated June 28, 2016, to a "Nicole Gracia" of Las Vegas, Nevada. He included the description "Helped pay some of her bills at various times."
At this stage, after the formation of all the entities and the inexplicable failure to initially disclose all under penalty of perjury, we finally have more detailed information. However, Defendant continues his pattern of omissions deep into the post-petition life of his bankruptcy case. For example, approximately a year after this last round of amendments, Defendant transferred THC to his Son, Donald P. Elsass, in April 2018, without seeking permission from the Court.
During the trial even more information about the scale of the lapses came to light. There the Court received testimony from the Defendant and his Son, Donald P. Elsass, along with financial information regarding Defendant's business interests. At this stage, the best means to explain all is to discuss each of the five entities separately.
Starting with ITR, its federal tax returns showed gross receipts/sales of $ 354,146.00 for 2014, $ 142,631.00 for 2015 and $ 78,276.00 for 2016. The ITR returns for both 2014 and 2015 listed Defendant as the sole shareholder. (Note that Defendant claims he transferred ITR to his Son sometime in 2014). In 2014, the ITR return shows Defendant received $ 73,465.00 in officer compensation; however, the 2015 return lists no officer compensation for Defendant.
For the next year, the ITR 2016 federal tax return finally showed Donald P. Elsass as the only shareholder, and that he received officer compensation of $ 12,425.00. However, the 2016 ITR return presented to the Court is not signed by anyone, including Donald P. Elsass, as the asserted new owner. In particular, the 2016 ITR return, in comparison to the two prior years, shows the highest level of total deductions ($ 541,818.00). This amount included a comparatively higher amount for travel ($ 34,234.00) and "miscellaneous" expenses ($ 333,754.00).
In addition to the ITR federal tax returns we discussed above, a 2016 financial statement for ITR showed total miscellaneous disbursements of $ 295,909.59. As part of these funds, Defendant is listed as *868 having received approximately $ 16,975.80 in the form of ATM, debit and check transactions. The 2016 ITR financial statement also shows that Defendant and Fairman made deposits into ITR of nearly $ 5,189.00.
Focusing now on bank information, ITR's Park National bank statements from May 2016 to December 2016 and associated checks, show disbursements to Defendant that total around $ 19,500.00. Notably, this account attained a zero-balance based upon a single debit transaction on December 1, 2016, for $ 25,841.87. This timing is a mere one month after Defendant's bankruptcy filing on November 2, 2016.
The second entity we will discuss is SOS. Namely, at trial its 2016 financial statement detailed asserted investment deposits, all immediately after the bankruptcy filing, from Defendant of $ 55,000.00 on December 7, 2016, $ 8,000.00 on December 15, 2016, and $ 11,000.00 on December 29, 2016. This 2016 SOS financial statement also details total disbursements to Defendant of approximately $ 20,686.45 in the form of ATM, debit and check transactions. According to the December 2016 to April 2017 First Financial Bank Statements in the name of SOS it issued checks to the Defendant that total approximately $ 24,168.85. In addition, a SOS check for $ 10,070.26 issued on January 26, 2017, is written to "Cash", and appears to bear the signature of the Defendant.
Turning to the tax return information for SOS, its 2016 federal return lists Defendant as the sole shareholder. The SOS 2016 return reflects total income of $ 128,522.00. This includes gross receipts/sales of $ 2,578.00 and investments of $ 125,944.00. The SOS 2016 return also shows total deductions of $ 130,386.00 including, meals and entertainment ($ 1,370.00), travel ($ 4,568.00), and "miscellaneous" ($ 121,798.00).
The third entity to consider is Fairman. Specifically, its 2016 federal tax return shows no income, but $ 17,003.00 in deductions, including $ 524.00 (advertising), $ 454.00 (meals and entertainment), insurance ($ 581.00), utilities ($ 1,296.00), travel ($ 2,403.00), and the largest category, "miscellaneous" ($ 11,382.00). The 2016 Fairman tax return lists Defendant as its sole shareholder.
Our fourth entity we will review is Star. Precisely, its 2016 federal return listed "Investments" as the only income for $ 25,050.00. Total deductions amounted to $ 25,088.00 including insurance ($ 581.00), travel ($ 901.00), supplies ($ 2,000.00), compensation of officers ($ 6,225.00), "miscellaneous" ($ 7,356.00), and rents ($ 8,000.00). This 2016 Star return lists Defendant as the sole shareholder.
Finally, we reach our fifth and last enterprise up for discussion, THC. Now, the Defendant testified that as of the date of the bankruptcy filing he owned 100% of this Company. It was formed to sell equipment and material for the legal growth of medical marijuana. Defendant testified, however, that it had no bank accounts until recently, and that its financial transactions were conducted through the accounts of ITR. Defendant and his Son testified that through this entity they traveled to fairs throughout Ohio to market the company, and had only one employee who they paid through ITR.
According to the testimony of Defendant and his Son, however, in April 2018 THC became the sole property of Donald P. Elsass. However, as noted above, Defendant failed to seek this Court's approval *869 for any transfer. In addition, said transfer did not include the payment of any consideration. According to their testimony, however, THC remains in operation with a website and a physical location in Columbus, Ohio. The testimony provided indicates that at the time of trial THC had inventory valued at approximately $ 50,000.00.
Having gathered together and discussed all this information and activity, we reach the stage of discerning the legal consequences for Defendant and this estate. Turning first to the legal standards, Plaintiff seeks to deny Defendant's discharge based upon concealment under Code Section 727(a)(2)(A), and false oaths or accounts under Code Section 727(a)(4)(A).
For background, denial of discharge provisions requires liberal application in favor of debtors; objecting parties bear the burden of proof by a preponderance of the evidence. Cho v. Park (In re Park) , 480 B.R. 627, 631-32 (Bankr. D. Md. 2012). However, there is no constitutional or fundamental right to a discharge. Grogan v. Garner , 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
Instead, debtors have a duty of candor in disclosing their assets and liabilities. Discharges are only granted to honest debtors in search of their fresh start. 11 U.S.C. § 521(a)(1)(A)-(B) ; U.S. Trustee v. Fonner (In re Fonner) , 573 B.R. 741, 744 (Bankr. S.D. Ohio 2017) ; Panda Herbal International, Inc., et al. v. Luby (In re Luby) , 438 B.R. 817, 826 (Bankr. E.D. Pa. 2010). Full disclosure is the sole obligation of debtors, and they cannot shift to trustees and creditors the burden of searching for assets. First United Bank & Trust Co. v. Buescher (In re Buescher) , 491 B.R. 419, 431 (Bankr. E.D. Tex. 2013).
Focusing specifically upon discharge denials under Section 727(a)(2)(A) of the Code (concealment), parties must prove by a preponderance that debtors intentionally hindered, delayed or defrauded creditors or trustees, through the transfer or concealment of property within one year prior to filing. Once movants establish a prima facie case, the burden shifts requiring debtors to produce credible evidence to explain their conduct. Robbins v. Haynes (In re Haynes) , 549 B.R. 677, 685 (Bankr. D. S.C. 2016).
Courts have defined "conceal" to include withholding knowledge of an asset the debtor is legally required to disclose. U.S. Trustee v. Zhang (In re Zhang) , 463 B.R. 66, 78 (Bankr. S.D. Ohio 2012) citing Buckeye Retirement Co., LLC, Ltd. v. Swegan (In re Swegan) , 383 B.R. 646, 654-55 (6th Cir. BAP 2008). The requisite intent is established through circumstantial evidence. Zhang , 463 B.R. at 78-79.
In this endeavor, courts look to guides along the way that includes, concealing pre-bankruptcy transfers, gifts, transfers to family members, and conveyances shortly after judgment entries. Zhang , 463 B.R. at 79 citing Marine Midland Bus. Loans, Inc. v. Carey (In re Carey) , 938 F.2d 1073, 1077 (10th Cir. 1991). In this manner, Courts must consider the monetary value of the concealed assets. Zhang , 463 B.R. at 79 (citations omitted). Parties, however, are not obligated to prove that harm resulted from the concealment. Keeney v. Smith (In re Keeney) , 227 F.3d 679, 685 (6th Cir. 2000).
Turning now to discharge denials under Code Section 727(a)(4)(A) (false oaths and accounts), courts must deny discharge if, "the debtor knowingly and fraudulently, in or in connection with *870 the case...made a false oath or account." 11 U.S.C. § 727(a)(4)(A). Again, the burden is by a preponderance of the evidence, and the factors include, a sworn material and knowingly false statement, made with fraudulent intent. Materiality is defined as being related to financial transactions, and involves the discovery or disposition of assets. Zhang , 463 B.R. at 86 (citations omitted).
The goal is to penalize the failure to disclose significant assets, or discourage actions that makes it more difficult for trustees to administer assets for the benefit of creditors. Mendelsohn v. Singh (In re Singh) , 568 B.R. 187, 196 (Bankr. E.D. N.Y. 2017). Trustees and creditors should not have to go digging through records to find what debtors knew to be accurate all along. Haynes , 549 B.R. at 686. Further, debtors do not decide what has value or is material; that's the province of trustees and creditors. Casamatta v. Holden (In re Holden) , 542 B.R. 455, 460 (Bankr. W.D. Mo. 2015). The emphasis is upon complete disclosure in the initial pleadings that will mold the actions of trustees and creditors, based upon reliable information. Even a single omission may warrant denial of a discharge. Singh , 568 B.R. at 196.
Further, regarding alleged false oaths and accounts, the intent requirement can be established where debtors have been reckless in preparation of their petitions, schedules, etc., including multiple misstatements and omissions that on their face are not reasonable given debtors' financial affairs, business interests, sources of income, and the totality of the circumstances. Singh , 568 B.R.at 196-98 ; Keeney , 227 F.3d at 686. For example, where debtors are engaged in an internet sales business, but fail to list in their schedules nearly 300 internet domain names, it is not plausible to feign innocence in the omission. Luby , 438 B.R. at 833. At last, the fact that debtors file amendments after discovery and prompting by trustees, will not necessarily shield debtors' past misbehavior, and salvage their chances of receiving a discharge. Singh at 197.
Having detailed our findings of fact and the related Code provisions and caselaw, we turn now to the conclusions of law. In this endeavor, the two bases for denial of discharge raised by Plaintiff (concealment and false oaths and accounts) are similar. For both provisions, the key factor is proof of intentional misbehavior. This is opposed to mere mistake, misunderstanding or inadvertent error. On this basis, both grounds are combined for further discussion.
The Court concludes that Plaintiff has sustained it burden of proof that Defendant's omissions and actions were intentional, rather than error based upon ignorance of the legal process. There are two primary reasons. First, given Defendant's background it is not plausible or credible to conclude that all the omissions are mere mistakes. Defendant is a college graduate, obtained a law degree and passed a bar examination. Having observed Defendant during the pre-trial and trial processes he appears to be intelligent, articulate and familiar with the legal ramifications of his actions.
Indeed, for the last nearly forty years of his life Defendant worked as an attorney, along with becoming an entrepreneur founding and operating numerous entities in multiple states. In these endeavors, he employed many people, brought his Son *871 into the business operations, and generated sufficient revenues to pay his living expenses. All this was done with apparent success, at least until the IRS intervened.
Further, Defendant is no novice to bankruptcy. This case is his second filing. Both bankruptcies included allegations of fraud and litigation challenging Defendant's entitlement to a discharge. Yet, even after all these financial mishaps, Defendant turned to other endeavors, including the recently legalized medical marijuana industry. These fundamental characteristics of Defendant make it implausible and incredible to believe that his actions and omissions are not intentional efforts to conceal and yes deceive.
Second, the quantity and quality of the omitted financial information renders it implausible and incredible to conclude that Defendant simply forgot to mention his numerous business interests. The financial records presented at trial show substantial revenues and expenditures, both before and after this second bankruptcy filing, in the form of debit, ATM, check, Western Union, and cash transactions, all involving Defendant and/or his Son. Further, Defendant breached corporate boundaries by banking for multiple entities through the same account. Given this maze of information it becomes extremely difficult to track Defendant's true income and assets. Certainly, all would have remained concealed but for the intense scrutiny and questioning during the meeting of creditors by the Chapter 7 Trustee, Plaintiff and DOJ.
Once Defendant finally filed amendments to his bankruptcy filing, further details emerged regarding the prepetition sale of a motor vehicle and the acquisition of a new one. Defendant added previously undisclosed gifts, plus additional bank accounts. Also, Defendant revealed different yearly aggregate income amounts, along with additional potential sources for that revenue.
The tax return information provided at trial for the years immediately around the bankruptcy filing show significant income. However, these returns are replete with vague entries for "investments", and the use of term "miscellaneous", all without documentation. The tax returns show substantial depreciation allowances, again without supporting documentation.
Further, Defendant transferred THC post-petition to his Son for no consideration. According to the testimony at the time of trial, THC had inventory valued at approximately $ 50.000.00. The Court notes that this transfer may well have been pursued as an additional basis for denial of discharge. See 11 U.S.C. § 727(a)(2)(B).
In sum, the quantity and quality of omitted information and actions taken by Defendant, makes it impossible for this Court to conclude that it is plausible or credible to find that this is a case of mere error. Rather, this Court finds and concludes that Plaintiff has sustained its burden of proof that Defendant acted with intent to conceal and falsely certified in this bankruptcy case that he disclosed all his assets and/or sources of income. For these reasons, the Court DENIES Defendant a discharge under Sections 727(a)(2)(A) and (a)(4)(A) of the Code.
IT IS SO ORDERED.