Melvin S. Hoffman, United States Bankruptcy Judge *659 I. Introduction
In a thirty-count complaint,[1] Gary W. Cruickshank, the plaintiff and chapter 7 trustee of the bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief against over forty named and dozens of unnamed defendants, including Newfit, LLC,[2] a Delaware limited liability company whose managers are defendants, Harold R. Dixon, who controlled BFG, and CapeCapital LLC, a Massachusetts limited liability company. CapeCapital, in turn, was BFG's sole manager and was, itself, managed by Mr. Dixon. BFG filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code[3] on January 26, 2016, at which time its debts exceeded $ 16 million. This adversary proceeding was commenced two years after the petition date on January 26, 2018.
Newfit has moved under Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b), to dismiss[4] count VI (turnover under Bankruptcy Code § 542(b) ), count XVI (conspiracy), count XVII (aiding and abetting), count XIX (fraud), count XX (intentional interference with contractual advantage), count XXI (tortious interference with contractual advantage), count XXIII (substantive consolidation), count XXIV (successor liability), count XXV (alter ego/piercing the corporate veil), and count XXIX (attorneys' fees). Newfit does not seek dismissal of the remaining counts against it for constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B) (count I), actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A) (count II), constructive fraudulent transfer under Massachusetts Fraudulent Transfer Act ("MFTA") § 5(a)(2) (count III), constructive fraudulent transfer under MFTA § 6(a) (count IV), actual fraudulent transfer under MFTA § 5(a)(1) (count V), turnover (count VII), unjust enrichment (count VIII), preferential transfer under Bankruptcy Code § 547 and MFTA § 6(b) (count IX), statutory reach and apply under Bankruptcy Code §§ 544 and 550 and Mass. Gen. Laws ch. 214, § 3(8) (count X), establishment of a resulting/constructive trust (count XI), and costs (XXX), and it asserts it will deal with those counts either through summary judgment or at trial.
At the outset, I note that the trustee does not contest dismissal of count XIX (fraud), count XXIV (successor liability) or XXIX (attorney's fees). I will, therefore, grant Newfit's motion to dismiss those counts.
II. Procedural History
In addition to Newfit, other defendants, including Mr. Dixon, CapeCapital, the law firm of Goodwin Procter LLP ("Goodwin") and two of its attorneys (collectively, the "Goodwin Defendants"), CapeCapital Maryland Heights, LLC, CapeCapital West Hartford, LLC, CapeCapital Irving, LLC (collectively, the "Cape Real Estate Entities"), and other defendants[5] also filed motions *660 to dismiss. A hearing was held on these motions on June 14, 2018. The Goodwin Defendants' motions to dismiss were allowed in part and denied in part by my memorandum and order dated January 8, 2019. See Cruickshank v. Dixon (In re Blast Fitness Grp., LLC) , No. 16-10236-MSH, 2019 WL 137109 (Bankr. D. Mass. Jan. 8, 2019) (" Blast I "). The motions to dismiss of Mr. Dixon, CapeCapital, and the Cape Real Estate Entities were allowed in part and denied in part pursuant to separate memoranda and orders dated April 30, 2019 ( Blast II , Blast III and Blast IV , respectively).[6] A complete procedural history and recitation of the trustee's factual allegations and my legal findings on certain of the trustee's claims are set forth in Blast I , II , III , and IV , which are incorporated herein by reference. Nevertheless, I reiterate below some of those factual allegations and supplement them with additional allegations as necessary to determine Newfit's motion to dismiss.[7]
III. Motion to Dismiss
A. Legal Standard
In ruling on the motion to dismiss, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences in the trustee's favor. Langadinos v. American Airlines, Inc. , 199 F.3d 68, 69 (1st Cir. 2000). A claim cannot be dismissed if the trustee has demonstrated a "plausible entitlement to relief." Sanchez v. Pereira-Castillo , 590 F.3d 31, 41 (1st Cir. 2009) (citing Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). A plaintiff's obligation requires more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
Inquiry into plausibility is a two-step process. "First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)." Rodriguez-Reyes v. Molina-Rodriguez , 711 F.3d 49, 53 (1st Cir. 2013) (citing Morales-Cruz v. Univ. of P.R. , 676 F.3d 220, 224 (1st Cir. 2012) ). "Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim to relief." Id. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.' " Schatz v. Republican State Leadership Comm. , 669 F.3d 50, 55 (1st Cir. 2012) (quoting Iqbal , 556 U.S. at 679, 129 S.Ct. 1937 ). " 'Moreover, each defendant's role in the [adverse action] must be sufficiently alleged to make him or her a plausible defendant. After all, we must determine whether, as to each defendant , a plaintiff's pleadings *661 are sufficient to state a claim on which relief can be granted.' " Rodriguez-Ramos v. Hernandez-Gregorat , 685 F.3d 34, 40-41 (1st Cir. 2012) (quoting Ocasio-Hernandez v. Fortuno-Burset , 640 F.3d 1, 16 (1st Cir. 2011) (emphasis in original); see also Penalbert-Rosa v. Fortuno-Burset , 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant.").
B. Trustee's Factual Allegations[8]
1. BFG
On February 14, 2011, CapeCapital, acting through Mr. Dixon, formed BFG, a Massachusetts limited liability company.[9] ¶ 74. CapeCapital was the sole manager of BFG, and Mr. Dixon, in turn, was the sole manager and a member of CapeCapital. ¶ 3. At its peak, BFG owned and operated over sixty fitness clubs bearing its name throughout the United States. (Intro., p. 2). At all relevant times, BFG acted at the direction of CapeCapital and Mr. Dixon. ¶ 92. BFG owned, entirely or partially, seventeen subsidiaries through which it operated its business.[10] ¶ 53. Fitness clubs at different locations were often operated through separate BFG subsidiaries, and those subsidiaries were often the actual tenants under the applicable leases for the premises. ¶¶ 251, 256. At all times relevant to the claims and causes of action alleged in the complaint, BFG was insolvent and insufficiently capitalized. ¶¶ 310-12.
In 2011 and 2012, BFG, Mr. Dixon and Steven Borghi, Mr. Dixon's business partner and a member of BFG, were mired in a dispute with Elizabeth Beninati, the widow of Mr. Borghi's previous business partner in the discount fitness club business. ¶¶ 71, 73, 76-79. Mr. Dixon, Mr. Borghi and BFG hired Mr. Dixon's longtime personal lawyer at Goodwin, John LeClaire, who is a defendant in this action, to represent them in negotiations with Ms. Beninati in April 2011. ¶ 80. Negotiations failed, and Ms. Beninati commenced a Massachusetts state court lawsuit against Mr. Dixon, Mr. Borghi and BFG on May 24, 2012, seeking millions of dollars in damages. ¶¶ 79, 376. Goodwin represented Mr. Dixon, BFG and Mr. Borghi in that litigation. ¶¶ 107, 376. In July 2014, the state court entered judgment against Messrs. Dixon and Borghi. ¶¶ 88, 315. Final judgment against them in excess of $ 4.5 million entered on January 9, 2015. ¶¶ 90, 317.
2. Lexfit and Newfit
In late 2012, while the Beninati litigation was pending, Mr. Dixon began transferring profitable BFG clubs to new entities in order to shield them from BFG's creditors such as Ms. Beninati. ¶¶ 82, 273, 308-309. Defendants Lexfit, LLC, a Massachusetts limited liability company, and Newfit, both managed by Mr. Dixon and/or CapeCapital, were two of these entities. ¶¶ 9, 10, 103, 273. Newfit was organized as a Delaware limited liability company after January 30, 2013 and before May of 2013. ¶¶ 180, 283.
3. Lexfit and Newfit Transactions
On December 6, 2012, Mr. Dixon, CapeCapital and another defendant transferred *662 sixteen of BFG's more profitable fitness clubs to Lexfit for no or nominal consideration. ¶¶ 274, 276. On January 30, 2013, Mr. Dixon, CapeCapital and another defendant transferred an additional eight of BFG's more profitable clubs to Newfit, which had not yet been created. ¶¶ 283-84, 289. BFG did not receive full consideration for these transfers. ¶ 285. Also on January 30, 2013, Lexfit transferred eight of the clubs received from BFG in the December 2012 transaction to Newfit for less than full consideration. ¶¶ 289, 291, 293.
On January 31, 2013, BFG assigned to Newfit all of its right, title and interest in a management agreement under which BFG managed three fitness clubs in Mashpee, West Roxbury and Needham, Massachusetts, which were owned by non-BFG entities.[11] ¶¶ 350, 352. Under the management agreement, which BFG had the right to assign, BFG managed the three clubs in exchange for a management fee equal to 50% of gross revenue which was later increased to 75% with respect to the Mashpee and West Roxbury clubs. ¶¶ 350-354. The term of the management agreement ended in January 2018, and it provided for a $ 2 million fee payable to BFG if the club owners terminated the agreement. ¶ 351. BFG transferred the rights to receive the clubs' gross revenues to Newfit in exchange for $ 10 while BFG retained the obligation to manage the clubs. ¶ 355.
4. Newfit and BFG
There was overlap between Newfit and BFG with respect to management, assets and operations. Both entities shared the same manager, CapeCapital, which, in turn, was managed by Mr. Dixon, who controlled BFG. Defendant Thomas Moran, who was BFG's Director of Finance, held the same position with Newfit. ¶ 345. Newfit rented office space at the same Auburndale, Massachusetts location as BFG but paid a lower rent. ¶ 358. Newfit was represented by BFG's general counsel, Peter Fenn,[12] in several matters. ¶¶ 12, 325. Newfit is also represented in this action by the same counsel representing Mr. Dixon, CapeCapital, the Cape Real Estate Entities and other Dixon-related entities and family members. On a date not specified in the complaint, BFG transferred all of its intellectual property in the fitness operation to Newfit without consideration. ¶ 329.
On March 18, 2013, Mr. LeClaire emailed Mr. Dixon about the creation of Newfit and related governance options, providing advice on how to "protect you better against things like what Beninati is doing." ¶ 301. In May 2013, after the creation of Newfit, Mr. LeClaire was aware that cash of the specific fitness clubs and Newfit was treated as "fungible." ¶ 180. Bank account records reflect multiple electronic transfers of funds between BFG and Newfit, demonstrating commingling of funds. ¶ 348-49. Goodwin advised Messrs. Dixon and Moran, in the context of the Beninati litigation, to avoid any discussion of Newfit and to maintain that the transfer of profitable clubs to a separate entity had "nothing to do" with the Beninati litigation and shielding assets from creditors. ¶ 180.
5. Landlords and Third Parties
BFG could not pay its debts as they arose and it implemented a strategy, through Mr. Dixon and CapeCapital, of *663 shifting assets from one fitness club to another. ¶¶ 255, 312. A large number of BFG's creditors are landlords who leased space to wholly-owned entities of BFG. ¶ 248. The landlords relied on guaranties from BFG, third party guarantors, or other obligors under the leases. ¶ 249. BFG purchased fitness clubs from sellers, assumed the sellers' obligations under existing leases and often breached its obligations to remove the sellers as obligors under the leases. ¶¶ 250, 359. When a club was shut down, the subsidiary, which was the actual tenant under the lease, would stop making rent payments to the landlord. ¶ 256. The landlord would sue the tenant, only to find that the assets of the tenant had been transferred to another subsidiary of BFG. ¶ 257. Landlords, guarantors, and obligors then pursued fraudulent transfer, indemnification and other claims against BFG and others. ¶¶ 198, 232, 257, 359-60.
From 2014 to 2016, BFG was involved in numerous lawsuits commenced by landlords and others for unpaid rents and other lease defaults. ¶¶ 186, 198-199, 231-33, 261. BFG could not satisfy its debts to landlords due to its insolvency. ¶ 186. On an unspecified date, Mr. Dixon forwarded an email from another principal of BFG to Goodwin advising that "I have gotten hammered today by many different vendors/contractors. I have threatening messages on my phone ...." ¶ 299.
6. 2015 Newfit Transactions
At the end of March 2015, Blast Fitness Acquisition, LLC, a BFG subsidiary and defendant in this action, transferred nine profitable health clubs worth between $ 7.6 (liquidation value) and $ 15.9 million (internal valuation based on a multiple of projected EBITDA) to Newfit in a cashless transaction, in exchange for which Newfit purported to retire $ 7 million of antecedent debt owed to it by Blast Acquisition. ¶ 319. Mr. Fenn represented both BFG and Newfit in the transaction. ¶ 212. The transfer was made to shield assets from creditors who had already begun to sue BFG. ¶ 320. On May 1, 2015, another cashless transfer from BFG to Newfit was made transferring the assets of a fitness club in Schaumburg, Illinois, valued at almost $ 600,000. Mr. Fenn represented Newfit in the transaction. ¶ 221.
After acquiring valuable clubs through Newfit, Mr. Dixon and another defendant then sold those clubs to Ed Eskandarian for a substantial markup, and Mr. Dixon continues to personally receive annual payments of $ 500,000 per year from Mr. Eskandarian. ¶ 331, 333.
IV. Trustee's Claims Against Newfit
A. Count VI-Turnover- Bankruptcy Code § 542(b)
In count VI of the complaint, the trustee asserts that Newfit owes BFG a debt in an unspecified amount "that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b). Newfit asserts it owes no debt to BFG within the meaning of Bankruptcy Code § 542(b).
1. Applicable Law
Bankruptcy Code § 542(b) provides:
(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.
11 U.S.C. § 542(b). Debts are "matured," "payable on demand," or "payable on order" if they are presently payable, "as *664 opposed to those that are contingent and become payable only upon the occurrence of a certain act or event." A.J. Calhoun v. Copeland Corp. (In re Gordons Transports, Inc.) , 51 B.R. 633, 636 (Bankr. W.D. Tenn. 1985). Bankruptcy Code § 542(b) explicitly references "property of the estate." Bankruptcy Code § 541(a)(1) defines "property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" 11 U.S.C. § 541(a)(1), and also includes "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, including Code § 550. 11 U.S.C. § 541(a)(3).
"A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing...It invokes the court's most basic equitable powers to gather and manage property of the estate." Braunstein v. McCabe , 571 F.3d 108, 122 (1st Cir. 2009) (citing 5 Collier on Bankruptcy, ¶ 542.02) (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2009)). Bankruptcy Code § 542(b) creates an action for turnover of matured debts owed to a bankruptcy estate. "These may be, for example, debts owed for accounts receivable, for judgments already obtained or for monies previously held in trust or in escrow." Nat'l Enters., Inc. v. The Koger P'ship, Ltd. (In re Nat'l Enters., Inc.) , 128 B.R. 956, 959 (E.D. Va. 1991).
2. Discussion
The trustee identifies in his opposition to the motion to dismiss the debts that should be turned over to him under Code § 542(b) as the $ 500,000 annual payments received by Mr. Dixon from Newfit's sale of fitness clubs to Mr. Eskandarian and the amounts Newfit allegedly deprived BFG from receiving under the assigned management agreement for the Mashpee, Needham and West Roxbury clubs. With respect to the latter contention, the trustee asserts that BFG remained liable under the contract to perform management services and that to the extent any management or termination fees are owed under that agreement, they belong to BFG.
The Eskandarian payments cannot form the basis of a claim against Newfit under Bankruptcy Code § 542(b) as the payments are alleged to have been made to Mr. Dixon, not Newfit, and I previously dismissed count VI against Mr. Dixon. See Blast II . To the extent, however, that on the bankruptcy filing date in 2016, any management or termination fees were owed to BFG under the management agreement in connection with the Mashpee, West Roxbury, and Needham clubs (which had a term ending in 2018), I find that such amount would have been matured and fixed as of the bankruptcy filing date and not contingent or payable upon the occurrence of a certain future act or event. I find sufficient facts alleged in the complaint to support a plausible claim for turnover of any such amount from Newfit, and thus I will enter an order denying Newfit's motion to dismiss count VI.
B. Count XVI-Conspiracy
In count XVI, the trustee alleges that, beginning no later than 2012 and continuing at least through BFG's bankruptcy filing date, Mr. Dixon and other count XVI defendants, including Lexfit, Newfit, CapeCapital, the Cape Real Estate Entities, and others, formed a "confederation" to siphon assets away from BFG, defraud BFG's creditors, and convert and steal BFG's assets, damaging its creditors. Newfit contends that the complaint provides no particulars about its conspiracy claims that are applicable to it.
*665 1. Applicable Law
In Aetna Cas. Sur. Co. v. P & B Autobody , the United States Court of Appeals for the First Circuit, applying Massachusetts law, identified two types of civil conspiracy. 43 F.3d 1546, 1563-64 (1st Cir. 1994). The first is a "very limited" "coercive type" of conspiracy where " '[i]n order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.' " Id. at 1563 (quoting Jurgens v. Abraham , 616 F. Supp. 1381, 1386 (D. Mass. 1985) and citing Fleming v. Dane , 304 Mass. 46, 22 N.E.2d 609 (1939) ). The second type of civil conspiracy, and the one upon which the trustee relies here, is "akin to a theory of common law joint liability in tort" where the word "conspiracy" is used to denote "vicarious liability" in tort for concerted action. Id. at 1564. The elements are (1) common design or agreement between two or more people to commit a wrongful act and (2) proof of some tortious act in furtherance of the agreement. Id. (citing Restatement (Second) of Torts § 876 cmt. b (Am. Law Inst. 1979)). "Where two or more persons act in concert, each will be jointly and severally liable for the tort." Id. There is a three year statute of limitations for the tort of civil conspiracy. Kadar Corp. v. Milbury , 549 F.2d 230, 234 (1st Cir. 1977) (citing Mass. Gen. Laws ch. 260, § 2A ) (applying a prior version of the statute which provided for a two year limitations period).[13]
The tort of aiding and abetting a breach of fiduciary duty requires that "(1) there must be a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants must have actively participated or substantially assisted in or encouraged the breach to such a degree that they could not reasonably have been acting in good faith." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP , 91 Mass. App. Ct. 835, 847, 81 N.E.3d 782 (2017) (citing Arcidi v. Nat'l Assn. of Gov't Employees , 447 Mass. 616, 623-624, 856 N.E.2d 167 (2006) ). In the context of a claim for conspiracy for breach of fiduciary duty, "[t]he claim for civil conspiracy ... similarly requires a showing that the defendants (1) knew that the conduct ... constituted a breach of fiduciary duty and (2) substantially assisted in or encouraged that conduct." Id. at 847-48, 81 N.E.3d 782 (citing Kurker v. Hill , 44 Mass. App. Ct. 184, 189, 689 N.E.2d 833 (1998) ) (footnote omitted).[14]
*666 2. Discussion
Newfit contends that there is no indication in the complaint of any tort that was the subject of the conspiracy other than an alleged breach of fiduciary duty which would not be applicable to Newfit because it did not owe BFG a fiduciary duty. The trustee maintains that Newfit assisted Mr. Dixon in breaching his fiduciary duties to BFG.
There are numerous specific allegations in the complaint to support a plausible claim that CapeCapital and Mr. Dixon knowingly engaged in a plan under which they breached their fiduciary duties to BFG and its members and that they, along with Newfit in connection with the Newfit transfers effected within the statute of limitations period in 2013 and 2015, each knew of the breaches of fiduciary duties and substantially assisted the other in that conduct for Mr. Dixon's benefit and not in good faith. Indeed, a primary grievance of the complaint is that Mr. Dixon created entities such as Newfit in a coordinated effort to divert company assets from creditors to recover his investment in BFG and otherwise enrich himself. Accordingly, I will enter an order denying Newfit's motion to dismiss count XVI.
C. Count XVII-Aiding and Abetting
In count XVII, the trustee asserts that certain defendants, including CapeCapital and Mr. Dixon, owed the members of BFG the fiduciary duty of care, loyalty and good faith, they breached those duties when they defrauded BFG's members and converted BFG's funds and assets, and Newfit aided and abetted such breaches. Newfit contends it did not owe a fiduciary duty to BFG. For the reasons stated above with respect to count XVI, Newfit's motion to dismiss count XVII will be denied.
D. Counts XX and XXI - Intentional and Tortious Interference with Contractual Advantage
With respect to counts XX and XXI, the trustee asserts that Newfit's assumption of the benefits of BFG's management agreement for the Mashpee, West Roxbury and Needham clubs, which left BFG responsible to perform the contract's obligations while receiving none of its benefits, constituted tortious interference with a contractual advantage.
1. Applicable Law
To prevail in an action for intentional interference with contractual relations, a plaintiff must establish that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enters., Inc. v. Falmouth Marine, Inc. , 410 Mass. 262, 272, 571 N.E.2d 1363 (1991) (citing United Truck Leasing Corp. v. Geltman , 406 Mass. 811, 812-817, 551 N.E.2d 20 (1990) ); see also Psy-Ed Corp. v. Klein , 459 Mass. 697, 715, 947 N.E.2d 520 (2011) (setting forth the same standard for "tortious interference with contract" and citing G.S. Enters., Inc., 410 Mass. at 272, 571 N.E.2d 1363 ). "A claim for intentional interference with contractual relations is one sounding *667 in tort." Pure Distribs., Inc. v. Baker, 285 F.3d 150, 154-55 (1st Cir. 2002) (citing United Truck Leasing Corp. , 406 Mass. at 812, 551 N.E.2d 20 ).
2. Discussion
From the facts alleged in the complaint, I cannot plausibly conclude that Newfit knowingly induced BFG or a third party to breach the management agreement. The complaint alleges that BFG exercised its assignment rights under the contract by transferring the right to receive management fees to Newfit while BFG maintained the burdens and liabilities of the agreement for little or no consideration. There are no allegations that the management agreement was breached as a result of Newfit's involvement or interference, and the claims are more in the nature of fraudulent transfer and/or aiding and abetting breach of fiduciary duty claims which are asserted in other counts of the complaint. Accordingly, I will enter an order allowing Newfit's motion to dismiss counts XX and XXI.
E. Count XXIII-Substantive Consolidation
In count XXIII, the trustee asserts that the assets and liabilities of BFG and the count XXIII defendants are intertwined and that inequity and harm would result to creditors if BFG were able to shed its liabilities while maintaining its assets through those defendants. He requests that the defendants' assets and liabilities be substantively consolidated into BFG's bankruptcy estate. Newfit notes disagreement among courts as to whether a debtor and non-debtor entity can be substantively consolidated. See, e.g. , Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.) , 213 B.R. 870, 876 (Bankr. D. Kan. 1997) ("There is doubt, however, whether the bankruptcy court has either subject matter or personal jurisdiction over a non-debtor."). Newfit maintains that even where recognized, substantive consolidation should be used sparingly, citing In re Owens Corning , 419 F.3d 195, 208-09 (3d Cir. 2005) (footnotes omitted) (citing Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.) , 860 F.2d 515, 518 (2d Cir. 1988) ), as amended (Aug. 23, 2005), as amended (Sept. 2, 2005), as amended (Oct. 12, 2005), as amended (Nov. 1, 2007) ("Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy in certain circumstances. No court has held that substantive consolidation is not authorized, though there appears nearly unanimous consensus that it is a remedy to be used 'sparingly.' ").
1. Applicable Law
Substantive consolidation "has been long recognized ... [as] a valid exercise of the courts' equitable powers under § 105." Gray v. O'Neill Props. Grp., L.P. (In re Dehon, Inc.) , No. 02-41045, 2004 WL 2181669, at *3 (Bankr. D. Mass. Sept. 24, 2004) ; see also 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). "Bankruptcy courts may substantively consolidate two or more related entities and thereby pool their assets. Substantive consolidation 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities.' " Logistics Info. Sys., Inc. v. Braunstein (In re Logistics Info. Sys., Inc.) , 432 B.R. 1, 10 (D. Mass. 2010) (quoting Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.) , 402 F.3d 416, 423 (3d Cir. 2005) ).
In Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.) , the First Circuit stated:
*668 Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs...The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs...Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.
954 F.2d 1, 11 n.15 (1st Cir. 1992) (internal citations omitted). The court added that because "[substantive] consolidation can cause disproportionate prejudice among claimants required to share the debtors' pooled assets, the party requesting substantive consolidation must satisfy the bankruptcy court that, on balance, consolidation will foster a net benefit among all holders of unsecured claims." Id. at 12 (footnote omitted) (emphasis in original); see also Lassman v. Cameron Construction LLC (In re Cameron Construction & Roofing Co., Inc. ), 565 B.R. 1 (Bankr. D. Mass. 2016) (noting that while substantive consolidation of two or more debtors' estates is widely accepted, a court, in an appropriate case, may also order the substantive consolidation of a debtor and non-debtor).
2. Discussion
As stated in Blast IV , I see no bar to substantive consolidation of a debtor and a non-debtor under appropriate circumstances, where, such as here, a complaint alleges with particularity a scheme among a principal and numerous entities he formed and controlled for the purpose of acquiring, diverting and transferring valuable assets and profit opportunities from a debtor to avoid the reach its creditors. See Gray v. O'Neill Props. Grp., L.P. , 2004 WL 2181669, at *3 ("Large corporations, such as the Debtor, often use multi-tiered corporate structures, and substantive consolidation has been used to reach the assets and liabilities of a non-debtor subsidiary corporation."). I find sufficient allegations in the complaint to plausibly support the conclusion that the assets and liabilities of BFG and Newfit were intertwined and that avoiding (already) protracted efforts to disentangle their affairs would be a net benefit to the estate. The complaint alleges with specificity that Newfit was organized in 2013 as a vehicle created by Mr. Dixon for the sole purpose of acquiring BFG assets (even prior to its legal existence) through a series of fraudulent transfers with BFG from 2013 through 2015 while BFG was being pursued by Ms. Beninati and then by landlords and other third parties over lease defaults. I find the trustee has alleged sufficient facts at this stage of the proceedings to support a plausible claim for substantive consolidation of Newfit and BFG. I will enter an order denying Newfit's motion to dismiss count XXIII.
F. Count XXV-Alter Ego/Piercing the Corporate Veil
In count XXV, the trustee asserts that defendants including Mr. Dixon, CapeCapital, Newfit, Lexfit, the BFG subsidiaries, the Cape Real Estate Entities and others each exercised pervasive control over BFG (and each other) and engaged in confused intermingling of business activity, assets and management. He seeks an order piercing the corporate veils separating those defendants and BFG and an order finding them liable as "alter egos" and thus liable for BFG's debts.
1. Applicable Law
In Massachusetts, corporations and their shareholders are generally *669 deemed to be distinct legal entities. See Berger v. H.P. Hood, Inc. , 416 Mass. 652, 657, 624 N.E.2d 947 (1993). Under unusual circumstances, however, a court may disregard the separateness of entities, particularly to defeat fraud or remedy an injury. See index="63" url="https://cite.case.law/citations/?q=624%20N.E.2d%20947">id. These efforts are often characterized as veil piercing or establishing alter ego status. "The doctrines of veil piercing ... and alter ego are interrelated and litigants often use the terms interchangeably. Indeed, a party may seek to pierce a corporate veil under an alter ego theory which is equitable in nature." Butler v. Candlewood Road Partners, LLC (In re Raymond) , 529 B.R. 455, 471 (Bankr. D. Mass. 2015) (citing Weiss v. Lockwood , 499 B.R. 392, 394 (D. Mass. 2013) (citing Miranda v. Gonzalez (In re Gonzalez) , No. 02-05485-BKT, Adv. P. No. 09-150, 2010 WL 3395677, at *2 (Bankr. D.P.R. Aug. 23, 2013) (footnote omitted)). "Nevertheless, veil piercing and alter ego can be distinguished." The Patriot Grp., LLC v. Fustolo (In re Fustolo) , 597 B.R. 1, 47 (Bankr. D. Mass. 2019) (citing U.S. Trustee v. Zhang (In re Zhang) , 463 B.R. 66, 81 (Bankr. S.D. Ohio 2012) )." 'The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct.' " Id. (citing IUUA Local 600 v. Aguirre , 410 F.3d 297, 302 (6th Cir. 2005) (footnote omitted)).
In My Bread Baking Co. v. Cumberland Farms, Inc ., the Massachusetts Supreme Judicial Court ("SJC") considered "[t]he circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control ...." 353 Mass. 614, 618-19, 233 N.E.2d 748 (1968). It explained that it is appropriate to depart from the general principle of corporate separateness in two situations:
(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of 'closely identified' corporations a court 'need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment.'
Id. (internal citation omitted).[15]
"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." Attorney General v. M.C.K., Inc. , 432 Mass. 546, 555, 736 N.E.2d 373 (2000). In M.C.K. , the SJC listed the factors to be considered when courts engage in an analysis of the My Bread principles:
The relevant factors are (1) common ownership; (2) pervasive control; (3) confused *670 intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.
Id. at 555 n.19 (citing Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc. , 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria set forth in My Bread ); Evans v. Multicon Constr. Corp. , 30 Mass. App. Ct. 728, 733, 574 N.E.2d 395 (1991) ); see also Birbara v. Locke , 99 F.3d 1233, 1240 (1st Cir. 1996) (" My Bread sets the standard for deciding when to pierce the corporate veil under Massachusetts law; Pepsi-Cola elucidates some factors that may be considered when engaging in a My Bread analysis."). "Massachusetts courts employ the alter ego doctrine to determine whether a principal of a corporation is its alter ego using the My Bread Baking Co. factors." In re Fustolo , 597 B.R. at 50.
Since its ruling in My Bread , the SJC has observed that under Massachusetts law, the corporate veil will only be pierced in rare situations. See, e.g. , Spaneas v. Travelers Indem. Co. , 423 Mass. 352, 354, 668 N.E.2d 325 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.") (citing My Bread , 353 Mass. at 620, 233 N.E.2d 748 ).
2. Discussion
With respect to count XXV, I find the trustee has alleged sufficient facts supporting "fraudulent or injurious consequence of the intercorporate relationship" and "confused intermingling" as a basis for corporate disregard of Newfit under My Bread , having specifically pleaded a number of the factors set forth in M.C.K. The gravamen of the complaint against Mr. Dixon and Newfit is the gross inequity and injury to BFG's creditors resulting from alleged fraudulent and improper use of numerous entities Mr. Dixon controlled, including Newfit, to misappropriate and divert BFG's assets beyond creditors' reach while BFG was insolvent. The trustee has sufficiently supported his claims with specific allegations concerning Mr. Dixon's pervasive control over Newfit (and its control over BFG), which was managed by him and CapeCapital, of which he was the sole manager and a member. Further, the trustee has sufficiently alleged that Mr. Dixon formed and/or used Newfit and other entities to promote fraudulent transactions in a common enterprise which benefited him and his affiliates. Lastly, he has included numerous allegations regarding intermingling of business activity and assets among BFG and Newfit. Both entities shared the same manager, office space, counsel, and director of finance, and Newfit's assets such as profitable fitness clubs, intellectual property, and rights under the management agreement were all acquired from BFG and its subsidiaries. While mindful that veil piercing will be permitted in only rare situations, I find at the Rule 12(b)(6) stage, with all reasonable inferences drawn in the trustee's favor, the allegations are sufficient to support a plausible claim for veil piercing and/or alter ego determination against Newfit and the numerous Dixon-controlled entities. I will enter an order denying Newfit's motion to dismiss count XXV.
V. Conclusion
Based on the foregoing, an order shall enter granting Newfit's motion to dismiss with respect to counts XIX, XX, XXI, XXIV, and XXIX of the trustee's amended *671 complaint and denying the motion with respect to counts VI, XVI, XVII, XXIII, and XXV.

As amended by a first amended complaint (ECF #130).

The complaint refers to Newfit, LLC while the motion to dismiss refers to NewFit, LLC.

All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 et seq.

ECF #171.

Defendants Juliet J. Dixon, and Thomas F. Walsh and Michael J. Craffey, as trustees of Harold R. Dixon IV GST Trust, George L. Dixon GST Trust, William A. Dixon GST Trust, John E. Dixon GST Trust, 31 Green Lane Nominee Trust and 63 Cart Path Road Nominee Trust also filed motions to dismiss which were allowed by separate memoranda and orders dated April 30, 2019.

See Cruickshank v. Dixon (In re Blast Fitness Grp., LLC) , No. 16-10236-MSH, 2019 WL 1950002 (Bankr. D. Mass. April 30, 2019) (Blast II ) and Cruickshank v. Dixon (In re Blast Fitness Grp., LLC) , No. 16-10236-MSH, 2019 WL 1978344 (Bankr. D. Mass. April 30, 2019) (Blast III ).

There are a number of other defendants in this adversary proceeding which have not answered or otherwise responded to the complaint, including certain BFG subsidiaries. These defendants are the subject of, among other claims, the trustee's claim in count XXIII for substantive consolidation with BFG. Although those defendants have not yet been defaulted, I will assume for purposes of this decision that BFG and the BFG subsidiaries (including defendant Blast Fitness Acquisition, LLC) are consolidated.

Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the first amended complaint.

Although not specifically pleaded in the complaint, there is no dispute that BFG is a Massachusetts limited liability company.

Each of the seventeen BFG subsidiaries is a defendant here. The subsidiaries are named in numerous counts of the complaint, including counts for fraudulent transfers, piercing the corporate veil/alter ego and substantive consolidation. None of the BFG subsidiaries has filed a responsive pleading to the complaint.

The complaint does not name the counterparties to the management agreement.

Mr. Fenn is a named defendant in the complaint. On October 5, 2018, the court approved a settlement between Mr. Fenn and the trustee which provided for the dismissal of all claims against Mr. Fenn in exchange for his payment of a settlement amount.

The statute provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A. See also Bankruptcy Code § 108, which provides, in part: "(a) If applicable nonbankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief." 11 U.S.C. § 108(a)(1) and (2).

Newfit is a Delaware limited liability company. "Massachusetts applies the internal affairs doctrine, which 'recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands.' " Mariasch v. Gillette Co. , 521 F.3d 68, 71-72 (1st Cir. 2008) (quoting Edgar v. MITE Corp. , 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) ). "The state with authority over a corporation's internal affairs is the state of incorporation." Id. (citing Harrison v. NetCentric Corp. , 433 Mass. 465, 470, 744 N.E.2d 622 (Mass. 2001) ). Newfit has not asserted in the motion to dismiss that any counts of the complaint should be considered matters pertaining to its internal affairs, and it has relied primarily on Massachusetts and First Circuit law in its brief. I will, therefore, not address Delaware law with respect to the counts it seeks to dismiss. See Scott v. NG U.S. 1, Inc. , 450 Mass. 760, 766 n.13, 881 N.E.2d 1125 (2008).

See Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC) , 447 B.R. 1, 36 (Bankr. D. Mass. 2011) ( "Although the standards for piercing the corporate veil are articulated most frequently with respect to corporations, this Court concludes that the same principles would apply for alter ego liability to attach to members of limited liability companies.").